The First National Bank and Trust Company of Port Chester, N. Y., a Banking Corporation, Plaintiff, *v.* New York Title Insurance Company, a Domestic Corporation, Defendant.

Supreme Court, Special Term, Westchester County, April 24, 1939.

*Wein & Wein*, for the plaintiff.

*D. William Leider*, for the defendant.

ALDRICH, J.   The plaintiff brings this action to recover under a policy of title insurance issued by the defendant, covering the interest of the plaintiff as mortgagee upon certain real property to the extent of $8,400.   The defendant pleads various defenses and a counterclaim for the cancellation or reformation of the policy. Many of the important facts of the case are not disputed.

In September, 1935, Max Karnowsky and Abe Karnowsky were, and had been for some thirty years, copartners engaged in the plumbing and heating business under the name of Karnowsky Brothers.   They were indebted to the bank upon firm notes, indorsed by the partners individually, to the extent of $4,575. These notes were overdue.   Prior to that time the partners had been the owners of certain real property known as 358 Willett avenue, in the village of Port Chester.   Some time in August, 1935, the Karnowskys transferred the Willett avenue property to one Ike Nathan, a relative by marriage.   This transfer came to the attention of the officers of the bank.   The notes were turned over to the attorneys for the bank and an action commenced thereon. Conferences developed between the bank and its attorneys and the Karnowskys and their attorney.   The Willett avenue property was subject to a first mortgage of $2,800 held by a third party. After some negotiations the Karnowskys agreed with the bank that the Willett avenue property should be reconveyed by Nathan to the Karnowskys, that the bank would take an assignment of the existing first mortgage for $2,800, that the Karnowskys would give an additional mortgage for $5,600, and that such two mortgages would be consolidated as one, the time of payment extended, etc. Out of the new mortgage there was to be paid all pending taxes and interest on the property; the balance was to be used in payment of the notes held by the bank.   The plaintiff, having in mind the consummation of this arrangement, applied to the defendant for a policy of title insurance upon its interest as proposed mortgagee.   The title was examined by the defendant and approved subject to certain exceptions not now material and the defendant company indicated its willingness to insure the title of the plaintiff accordingly.

The transfer of the title was consummated on September 30, 1935.   The closing took several hours.   The preparation of the papers and the handling of the closing was attended to by an

attorney representing the title company, who later took care of recording the documents. By the transaction the property was conveyed back to the Karnowskys. The first mortgage of $2,800 was assigned to the bank. The new mortgage of $5,600 was executed and delivered to the bank. The consolidation agreement between the Karnowskys and the bank was duly executed. The papers were promptly recorded. The proceeds of the new mortgage were used for the payment of the notes and the other purposes indicated. The notes were surrendered and the action then pending on the notes was discontinued.

In accordance with its arrangement the title company issued its policy of title insurance, dated September 30, 1935, whereby it insured the plaintiff against all loss or damage not exceeding $8,400 " which the insured shall sustain by reason of any defect in the title of the insured to the estate or interest described in Schedule A hereto annexed, affecting the premises described in said schedule, or by reason of the unmarketability of the title of the insured described in said schedule to, or in said premises, or because of liens or incumbrances against the same at the date of this policy," subject to certain execptions mentioned in Schedule " B," or excepted by the conditions of the policy. By Schedule " A," subdivision 1, the estate or interest insured by the policy was stated to be " Interest as mortgagee." By Schedule " A," subdivision 2, the description of the property the title to, or an interest in which was thereby insured, was the Willett avenue property. By Schedule " A," subdivision 3, the deed or other instrument by which the title or the interest thereby insured was vested in the insured was stated to be the assignment of the $2,800 mortgage, the new mortgage for $5,600 and the consolidation agreement. The excepted objections to title, etc., contained in Schedule " B, did not include any specification of any possible invalidity of the mortgage because in violation of the Bankruptcy Act against preferences.

On January 20, 1936, a petition in involuntary bankruptcy was filed against Max Karnowsky and Abraham Karnowsky, individually and as copartners doing business as Karnowsky Brothers. On February 5, 1936, they were duly adjudicated bankrupts accordingly by the District Court in the Southern District of New York. A trustee in bankruptcy was thereafter duly appointed. The trustee instituted an action in the District Court to set aside the $5,600 mortgage held by the bank on the ground that it was a preference. Issue was joined by the bank by the service of an answer containing a general denial. The bank gave notice to the title company of the institution of the action and demanded that

the title company defend the suit. It appears that the title company, through the attorneys for the bank, defended the action under a disclaimer and subsequently paid the expenses of defending the case, without prejudice to the disclaimer. The case came on for trial in the District Court. On July 27, 1937, the court made its formal decision, containing findings of fact and conclusions of law, as a result of which judgment was directed setting aside the $5,600 mortgage upon the ground that it constituted a preference in violation of the Bankruptcy Law. Judgment was entered upon that decision on July 27, 1937, canceling the $5,600 mortgage and the consolidation and extension agreement made thereunder. The first mortgage of $2,800 held by the plaintiff was validated to the extent of the full amount, with interest from August 1, 1937. No appeal was taken from that judgment. The plaintiff brings this action to recover the loss which it claims to have sustained under the policy. The amount demanded by the plaintiff in the complaint was $4,884.08. Upon the trial it was conceded that a final dividend to the plaintiff upon its claim as a general creditor for the amount by which it had been deprived of the benefits of the mortgage, amounting to $577.43, had been paid to the plaintiff through the bankruptcy court. The amount which the plaintiff claims is, therefore, $4,306.65. The bookkeeping statements presented on behalf of the plaintiff establish this amount as the paper loss. The defendant raises various objections to any recovery by the plaintiff.

*First.* The defendant contends that the policy cannot, in any event, be construed to cover the hazard of a loss sustained by the plaintiff by reason of the fact that the mortgage of $5,600 was declared invalid under the Bankruptcy Law. With this contention the court cannot agree. The title company knew that a new mortgage of $5,600 was to be given. It knew that the proceeds of that loan were to be used to pay the notes. It was fully acquainted with the general nature of the proposed transaction. It never indicated in the negotiations any intention not to cover this risk. There was never any oral agreement between the bank and the title company that the risk should not be covered by the policy. The policy insured the bank as mortgagee. The $5,600 mortgage was specifically included under Schedule " A." This particular risk was not excluded under Schedule " B." The policy, by its terms, insured against any loss or damage by reason " of any defect in the title of the insured to the estate or interest described." On the face of the policy it includes this particular defect in the title to the $5,600 mortgage. In accordance with the general rule, doubts and ambiguities, if any, contained in a

policy of title insurance are to be resolved in favor of the insured, where the contract is drawn up by the insurer. (62 C. J. 1056, § 18; *Marandino* v. *Lawyers T. I. Corp.*, 156 Va. 696; 159 S. E. 181; *Broadway Realty Co.* v. *Lawyers T. Ins. & T. Co.*, 226 N. Y. 335, 337.) The policy, by its foregoing terms, certainly does not exclude the hazard of an attack on the mortgage under the Bankruptcy Law. There is no ambiguity on the face of the policy with respect to those provisions. But if there were such an ambiguity it would have to be resolved against the defendant which drew the contract. Subdivision 13 of the conditions of the policy provides as follows: " Defects and incumbrances * * * created, suffered, assumed or agreed to by the insured * * * are not to be deemed covered by it." The invalidity of the mortgage because of preference was certainly a defect in the title of the bank to the mortgage insured. The words " assumed or agreed to " had reference to some particular defect or incumbrance assumed or agreed to by the bank by the title conveyance to it or by some collateral agreement made by the bank with reference to that specific subject-matter. Such words do not apply here. The word " created " had reference to some affirmative act on the part of the bank itself. The bank took the mortgage but it did not create the defect. That was created by operation of law. Such a clause does not protect the defendant from the very act insured against, which was the taking of the mortgage. (*Broadway Realty Co.* v. *Lawyers T. Ins. & T. Co.*, 226 N. Y. 335.) The word " suffered " has been variously defined, as to allow, to let, to permit. (60 C. J. 990, 991.) In one sense, " suffer " is synonymous with " permit." (*People ex rel. Price* v. *Sheffield Farms Co.*, 225 N. Y. 25, 31.) " Permit," in one sense, connotes something less than consent (*People ex rel. Price* v. *Sheffield Farms Co.*, *supra*), but in another sense it may mean an authorization by the party in question. (*Cowley* v. *People*, 83 N. Y. 464, 471; *People* v. *Harrison*, 183 App. Div. 812, 815.) And to permit or suffer an act usually implies the power to prohibit, prevent or hinder it. (*Robertson* v. *Ongley Electric Co.*, 82 Hun, 585; affd., 146 N. Y. 20.) In another sense, the word " permit " means " consent." (*Chaika* v. *Vandenberg*, 252 N. Y. 101.) It may mean to grant, to give leave. (*Atwater* v. *Lober*, 133 Misc. 652, 654.) It has been said that every definition of " suffer " and " permit " includes knowledge of what is to be done under the sufferance and permission, and intention that what is done is to be done. (*Gregory* v. *United States*, 17 Blatchf. 325.) The Federal court did not adjudge that there was any actual intent on the part of the bank to obtain a preference. Nor does the evidence justify such a finding here.

The mortgage could constitute a preference without such an actual intent on the part either of the mortgagors or the mortgagee. Enough has been said to indicate that the word " suffered " does not necessarily have to be construed to the broad extent claimed by the defendant. It may very well be that reasonable men, even learned in the law, might differ as to the use of that word. Here, then, the general rule of interpretation must be applied. The contract was drawn by defendant. In construing its terms, if any are doubtful or uncertain, defendant must bear the burden. Is its meaning so doubtful that plaintiff has the advantage of a reasonably beneficial interpretation of its language? Ought defendant in reason to have understood that plaintiff would give the policy the meaning which it now seeks to sustain? (*Broadway Realty Co.* v. *Lawyers T. Ins. & T. Co.,* 226 N. Y. 335, 337.) The answer must be in the affirmative. We cannot say that plaintiff did not and might not so read it. If it may thus be read, it must thus be read. (*Broadway Realty Co.* v. *Lawyers T. Ins. & T. Co., supra.*)

*Second.* The defendant contends that if the policy be construed to cover such a risk, then the defendant had no authority to enter into any such agreement and that the policy is null and void with respect thereto. This contention cannot be sustained. The Insurance Law specifically authorized the defendant to " guarantee or insure the owners of real property and chattels real and others interested therein against loss by reason of defective titles and incumbrances thereon." (Insurance Law, § 170.) The quality of a title is a matter of opinion, as to which even men learned in the law of real estate may differ. A policy of title insurance means the opinion of the company which issues it, as to the validity of the title, backed by an agreement to make that opinion good, in case it should prove to be mistaken, and loss should result in consequence to the insured. (*Foehrenbach* v. *German American T. & T. Co.,* 217 Penn. St. 331; 66 A. 561.) At common law and in the absence of statutory prohibition, an insolvent debtor has the right to prefer one creditor over others. A preference is *malum prohibitum* only to the extent that it is prohibited by the Bankruptcy Act. (8 C. J. S. 696, § 213; *Lehrenkrauss* v. *Bonnell,* 199 N. Y. 240; *Van Iderstine* v. *Nat. Discount Co.,* 227 U. S. 575; Debtor and Creditor Law, § 23, and annotations in 12 McKinney's Cons. Laws, pp. 76–84.) A preference within the provisions of the Bankruptcy Act is voidable only and not void, that is, the preference is valid until avoided, not void until validated. (8 C. J. S. 697, § 213, and cases cited.) The coverage of this particular risk by the policy was not in contravention either of law or of public policy. There

is no evidence to suggest that there was any intentional fraud on the part of the bank or in fact any actual intention on its part to take a preference through the medium of the mortgage. To avoid the mortgage as a preference, it was not necessary that there should be an actual intent on the part of the beneficiary to obtain a preference. (8 C. J. S. 714.) There was nothing inherently wrong about the transaction, which would invalidate the policy as a contractual obligation on the part of the title company. Lawful the mortgage was at the moment of the making, though the bank had cause to believe that the effect of the payment would be a preference among creditors. The statute does not say that one who accepts a payment from a debtor believed to be insolvent is guilty of a fraud. A payment so made is not even voidable thereafter unless a petition in bankruptcy follows within four months. If that interval elapses with bankruptcy postponed, the preference, however dubious in its making, is proof against assault. We may not hold in such conditions that the plaintiff by the mere acceptance of the mortgage was guilty of a wrong and so engaged in an illegal act. *(Carson v. Federal Reserve Bank*, 254 N. Y. 218, 234.)

*Third.* The defendant argues that the insured has not sustained any loss or damage within the meaning of the policy. The reasoning seems to be that because the plaintiff held certain notes before the mortgage was given, the adjudication by a decree of the Federal court did nothing more than put the plaintiff where it had been previously. This contention also must be overruled. What the defendant insured was the validity of the mortgage. By the policy (Conditions, subd. 2) a claim for damages arose: " (IV.) When the insurance is upon the interest of a mortgagee, and the mortgage has been adjudged by a final determination in a court of competent jurisdiction to be invalid, or ineffectual to charge the premises described in this policy." That is exactly the situation which has arisen here. The policy insured a first lien to the extent of $8,400. By the decree of a competent court that lien was limited to the amount of $2,800. The word " loss " is a relative term. Failure to keep what a man has or thinks he has is a loss. To avoid a possible claim against him; to obviate the need and expense of professional advice, and the uncertainty that sometimes results even after it has been obtained, is the very purpose for which the owner seeks insurance. To say that when a defect subsequently develops he has lost nothing and, therefore, can recover nothing, is to misinterpret the intention both of the insured and the insurer. (*Empire Development Co.* v. *Title G. & T. Co.*, 225 N. Y. 53, 59, 60.) Under such a policy the insurer is liable for the actual loss sustained. (*Montemarano* v. *Home Title Ins. Co.*, 258 N. Y. 478.)

A leading case on the precise point is *Foehrenbach* v. *German American T. & T. Co.* (217 Penn. St. 331; 66 A. 561.) In that case the plaintiff supposed that he was the owner of the entire interest in certain real property. He applied to the defendant for title insurance. The policy was issued. Subsequently others claimed an interest in the premises. They brought an action in which it was held that the plaintiff possessed only a half interest and not the whole of the property. The trial court dismissed his complaint against the title company, upon the ground that he had lost nothing. Upon appeal the plaintiff was awarded judgment in his favor. It was said that " failure to keep that which one has is loss." Also, " the estate or interest of the insured which was covered by the policy was that of owner in fee of the entire property, and any defect in title which reduced his interest below that point was, it seems to us, just that much loss, or damage, for which he was entitled to be indemnified." That decision is directly applicable here. Applying these principles, the plaintiff here certainly sustained a loss and damage within the meaning of the policy. The following figures, conclusively established by the plaintiff, show the bookkeeping loss:

Original total of both mortgages...................... $8,400 00
Less payments through amortization.................. 426 88

Unpaid principal of mortgages at date of decree..... $7,973 12
*Credits chargeable against bank:*
Balance in escrow account................ $29 20
Due from trustee on accounting as per decree. 106 37
Received from agent's rent account........ 153 47
By mortgage validated by decree.......... 2,800 00
                                        ————— 3,089 04

Loss or damage to date of decree................ $4,884 08
Less bankruptcy dividend on claim of $4,884.08....... 577 43

Net loss and damage............................ $4,306 65

The foregoing figure would not necessarily be the amount of a recovery to which the plaintiff would be entitled. The title company did not guarantee the payment of the debt. It did not insure the adequacy of the security. We must, therefore, consider the value of the property which stood as security for the $8,400 mortgages. That property after recovery by the trustee in bankruptcy was sold for $5,900. That, however, was obviously a

forced sale. The bankruptcy proceeding had to be closed up. The evidence shows that the trustee was pressing the agent to get some customer at some price. The defendant offered testimony upon this trial that the fair value in July, 1937, was $5,650 but that testimony is not convincing, when considered in connection with the income and other pertinent factors. The witness for the plaintiff gave a value of $9,000. In order to cover the entire loss of the plaintiff, the property, even allowing $500 for the expenses of a possible foreclosure, needed only a value of $8,473.12. The court is satisfied, and it will be found as a fact, that the actual value of the property prior to and at the time of the decree was $9,000. As a matter of fact, the property was more than paying its way when the mortgage of $5,600 was declared invalid. It has more than paid its way since that time. Under the circumstances, to say there would have been a foreclosure is purely speculation. The value of the underlying property is not the sole index of the worth of a mortgage. The ascertainment of such value is a matter of the exercise of reasonable judgment after an intelligent and honest canvass of all factors relevant to the particular security. (*Matter of New York Title & Mortgage Co.*, 277 N. Y. 66.) So considered, the mortgage was reasonably worth the face thereof. If the plaintiff is entitled to recover anything, it is entitled to a judgment for $4,306.65, with interest from the date the invalidity was adjudged.

*Fourth.* The defendant contends that the decision of the Federal court is *res judicata* against the plaintiff here to such an extent that the plaintiff has absolutely no right of any recovery under any circumstances. As stated, the plaintiff gave the title company notice of the institution of the action in the Federal court against it. The title company disclaimed responsibility under the policy but defended without prejudice to the disclaimer through the attorneys for the bank. Under the circumstances the judgment of the Federal court is *res judicata* both for and against both parties to this action to the extent of its effect as a final judgment. It is *res judicata* here against the title company to the extent that it adjudged the invalidity of the $5,600 mortgage. (*Foehrenbach* v. *German American T. & T. Co., supra; Alabama Title & Trust Co.* v. *Millsap,* 71 F. [2d] 518.) In the *Alabama Title & Trust Co.* case (*supra*) the court said that both the title company and the insured were mutually bound by the judgment and that its mutual estoppel extended fully to all that it found as its basis. In *Fulton Co. G. & E. Co.* v. *Hudson River T. Co.* (200 N. Y. 287) it was held that sound public policy requires that different judicial decisions shall not be made on the same state of facts, and that a judgment rendered

jurisdictionally and unimpeached for fraud shall be conclusive, as to the questions litigated and decided, upon the parties thereto and their privies, whom the judgment, when used as evidence, relieves from the burden of otherwise proving, and bars from disproving the facts therein determined. The court said that the principle is well settled that, by notice and opportunity to defend an action, the party notified becomes a party thereto, so as to be concluded in any subsequent litigation between the same parties as to all questions determined in the action which are material to the right of recovery in the second action, and the judgment in the first action is conclusive upon the defendant in the first action in the character of plaintiff in the second action, as to the facts thereby determined (p. 297). The court also said, however, that the record in the first action may disclose a state of facts showing that the defendant is or is not liable over to the plaintiff. It may disclose that the facts through which the plaintiff demands the indemnity from the defendant were not litigated therein, and, if they were not, they may be litigated in this action through evidence not produced thereat (p. 297). Applying these rules to the present situation, the judgment in the Federal court action is *res judicata* upon both the plaintiff and the defendant here with respect to the invalidity of the $5,600 mortgage as a preference under the Bankruptcy Law. To what extent is it further *res judicata* against the plaintiff with respect to additional matters? The decision and judgment are in evidence here. The testimony taken upon the trial is not in evidence here. The formal decision did not determine that the bank knew that the Karnowskys were insolvent. It did determine that the bank accepted the bond and mortgage, etc., " knowing or having reason to believe that it was receiving a preference under the provisions of the Bankruptcy Act." As *res judicata* such finding can be given effect only to the extent of saying that it was thereby adjudicated that the bank had reasonable cause to believe that it was receiving a preference. The judgment determined that the $5,600 mortgage constituted a preference but it made no specific adjudication with respect to any particular knowledge on the part of the bank. The decision found no specific facts against the bank on the subject of the information going to make up the " reasonable cause to believe that it was receiving a preference." To determine the effect of this adjudication upon the plaintiff as to its rights here, some reference to the Bankruptcy Law then in effect is pertinent. The general principles with respect to what had to be established in the Federal court action in order to adjudge the mortgage a preference may be summarized as follows (8 C. J. S. 696–720, §§ 213, 215): (1) The insolvency

of Karnowsky Brothers at the time the mortgage was given; (2) the giving of the mortgage within four months prior to the filing of the petition in bankruptcy; (3) the necessity that the bank would thereby obtain a larger percentage of its debt than any other creditor of the same class; (4) the diminution or depletion of the estate of Karnowsky Brothers resulting from the alleged preference; (5) that the bank had reasonable cause to believe, at the time of the mortgage, that the enforcement of the transfer would effect a preference. The insolvency of Karnowsky Brothers at the time of the mortgage was an essential element of the District Court action. The adjudication against the plaintiff in that action is *res judicata* here that Karnowsky Brothers were insolvent at that time. Fraudulent intent to obtain a preference on the part of the bank was not essential to maintain the action. The judgment is, therefore, not *res judicata* here that the bank had any fraudulent intent. The invalidity of the mortgage as a preference did not depend on whether or not Karnowsky Brothers intended to give a preference or whether or not they knew they were insolvent. Therefore, that adjudication is not *res judicata* here against the plaintiff as a determination that Karnowsky Brothers knew they were insolvent or intended to give a preference. It was essential to establish in the Federal court action that the effect of the mortgage was to constitute a preference. The judgment there is consequently *res judicata* here that a preference, in fact, resulted therefrom. It was also essential to establish that at the time of the mortgage the bank had reasonable cause to believe that the transaction would effect a preference, but this did not require that there should be reasonable cause to believe that a preference was intended. What constitutes reasonable cause depends upon the facts and circumstances of each case. Actual knowledge or belief is not necessary. The judgment of the Federal court can be given, therefore, only the effect of an adjudication that the bank had reasonable cause to believe that the mortgage would effect a preference. To that extent it is *res judicata* here. To that extent only did the decision and the judgment themselves purport to go. It is not an adjudication here that the bank had any actual knowledge or belief that the transaction would effect a preference. So considered, the adjudication is *res judicata* against the plaintiff to the extent that the sum total of the underlying facts and information in the possession of the bank, at the time of the mortgage, was sufficient to lead a reasonably prudent man to have reasonable cause to believe that the transaction would effect a preference. What those specific facts and information consisted of was not adjudicated. This reasoning leads to the conclusion that the judg-

ment of the Federal court is not *res judicata* here that any specific underlying facts or information were in the possession of the bank or that the title company did not have any knowledge or information on its own account at the time of the mortgage with respect to all such underlying facts and circumstances. In other words, the question of what the bank knew in the way of particular facts and circumstances and the question of what the title company knew with respect to the same facts and circumstances is open for litigation between these parties in this action.

*Fifth.* The defendant pleads as a defense that provision of the policy which reads as follows (Conditions, subd. 5): " Any untrue statement made by the insured, or the agent of the insured, with respect to any material fact; any suppression of or failure to disclose any material fact; any untrue answer, by the insured, or the agent of the insured, to material inquiries before the issuing of this policy, shall void this policy."

It is upon the facts of the case, in the light of these provisions of the policy, that the litigation must be finally determined. The general principles applicable to such a subject-matter are substantially well settled. A title policy is one of insurance, so that it is governed for purposes of construction by the rules applicable to other insurance contracts. (62 C. J. 1056, § 14; *De Carli* v. *O'Brien*, 150 Ore. 35; 41 P. [2d] 411.) In accordance with the general rule, an innocent misrepresentation of a fact material to the risk will avoid a policy of title insurance. (62 C. J. 1058, § 25; *Union Trust Co.* v. *Real Estate T. Co.*, 27 Pa. Co. Ct. 187.) Where a title insurance policy so provides, the suppression of a material fact will void the policy. (62 C. J. 1058, § 27; *Rosenblatt* v. *Louisville Title Co.*, 218 Ky. 714; 292 S. W. 333.) A failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the option of the company. (*Stipeich* v. *Metropolitan Life Ins. Co.*, 277 U. S. 311.) Concealment of material facts by the insured is a defense. (*Vaughan* v. *United States T. G. & I. Co.*, 137 App. Div. 623.) The same rule is laid down in other cases. (*Phillips* v. *U. S. F. & G. Co.*, 200 App. Div. 208; affd., 234 N. Y. 618; *Town of Hamden* v. *American Surety Co.*, 93 F. [2d] 482; *Raebeck* v. *Title Guarantee & T. Co.*, 229 App. Div. 727; *Sebring* v. *Fidelity-Phenix Fire Ins. Co.*, 255 N. Y. 382.) What is material under such circumstances has been the subject of judicial consideration. In *Geer* v. *Union M..L. Ins. Co.* (273 N. Y. 261) the court said (p. 266) that the question in such case is not whether the insurance company might perhaps have decided to issue the policy even if it had been apprised of the truth; the question is whether failure to state the truth where there was duty to speak

prevented the insurance company from exercising its choice of whether to accept or reject the application upon a disclosure of all the facts which might reasonably affect its choice, and (p. 269) the question in such case is not whether the company might have issued the policy even if the information had been furnished; the question in each case is whether the company has been induced to accept an application which it might otherwise have refused, as any misrepresentation which defeats or seriously interferes with the exercise of such a right cannot truly be said to be an immaterial one. Materiality is a matter of degree and a misrepresentation through concealment of a fact is material where it appears that a reasonable insurer would be induced thereby to take action which he might not have taken if the truth had been disclosed (p. 272).

Tested by these rules, the disposition of this case seems clear. Without considering controverted matters, the undisputed proof with respect to certain of the subject-matter shows both an affirmative misrepresentation and a misrepresentation through non-disclosure on the part of the plaintiff. There was a specific misrepresentation with respect to one material fact. It is undisputed that the financial condition of Karnowsky Brothers was substantially the same at the time of the adjudication in bankruptcy as at the time when the mortgage was given. The officers of the plaintiff, upon the trial, claimed a thorough understanding on their part of the underlying facts with reference to the financial situation of the debtors. The claims allowed in bankruptcy aggregated $13,313.86. Of this total $4,884.08 was the claim of the plaintiff arising through the invalidity of the mortgage; $3,341.44 was the claim of Mutual Trust Company, concerning which both the plaintiff and the defendant were informed at or before the time of the closing, $1,490 was a claim on a second mortgage which covered certain real property of the bankrupts at 26–28 Rollhaus place, such mortgagees having disclaimed the security and having elected to stand as general creditors. This item was not considered as an unsecured claim by either plaintiff or defendant. Technically it was not an unsecured claim at that time. These three items aggregate $9,715.52. The balance of $3,598.34 represented unsecured claims of general creditors. It appears that the attorney for Karnowsky Brothers in the discussion with an officer of the bank stated that the merchandise creditors totaled about $3,000. The attorney for the bank in his conference with the attorney for the title company does not appear to have stated the figures on such claims. He told them about the plaintiff bank and Mutual Trust Company claims and testified that with these exceptions he told the attorney for the title company " the general creditors were very small, very

few." At the closing the attorney for the title company was given to understand by those present that the general creditors were very few and the amount inconsequential or negligible. Three thousand dollars is a substantial sum of money. There was a misstatement on that material subject.

There was a non-disclosure of various material matters. The bank failed to disclose the fact that it had in its files two credit statements from Karnowsky Brothers, one under date of October 18, 1933, and one under date of October 2, 1934. Referring, for a moment, to the second one, it appears that this statement was returned to Karnowsky Brothers when originally received by the bank " due to the irregularity appearing on the face of the same." The Karnowskys sent it back without correction. Neither the fact of the existence of the statement or its return by the bank with the expression quoted were made known to the title company. That there was at least one irregularity appearing on the face of the statement is certain. Under notes payable to banks the debtors listed $3,800. The claims of the bank itself, without considering the Mutual Trust Company, were in excess of that amount. The statement also discloses a gross overvaluation, among others, of the Willett avenue property. It was estimated at $25,000, when not even the officers, who claimed to be familiar with real estate values, have suggested any value in excess of $9,000. In connection with other circumstances, this statement had additional importance. By the statement certain premises at 407 North Main street were given an estimated value of $35,000, with mortgages of $10,850. In March, 1935, there came to the attention of the bank the fact that this property had been conveyed to one Markel. An estimated equity of some $24,000 thereby disappeared from the assets of the debtors. The fact of the conveyance known to the bank was not disclosed to the defendant. At the time of the mortgage the four months' period in which to attack the conveyance of March had expired under the Bankruptcy Law. The bank officers were fully familiar with the fact that the debtors were crowded for lack of cash. There was no disclosure to the defendant that a $24,000 unexplained departure of assets had occurred. If the explanation be that the value as estimated was grossly overstated, then the fact that the debtors had overstated was material to the defendant. If the explanation be that the property was conveyed without consideration, then it indicated a willingness on the part of the debtors to dispose of their property in such fashion and such willingness was a material matter from the standpoint of the defendant. If the explanation be that an additional consideration was paid and devoted to other purposes, then the disposition thereof was unknown. That also was material. If there be no explanation.

and the record gives none, then the fact of the conveyance itself, in the light of the preceding statement, was of the utmost importance from the standpoint of the defendant. The bank knew that the deposit account of Karnowsky Brothers in the bank had been closed many months previously. The fact of the closing was not communicated to the defendant. The bank also knew that prior to the closing that account had been repeatedly overdrawn for a period of at least a year. That fact was not disclosed. On the contrary, the representation was made to the title company that Karnowsky Brothers had been customers of the bank for many years and that the bank thought very well of them. A comparison of the two financial statements also shows that the incumbrances upon 407 North Main street had increased from $7,500 on October 18, 1933, to $10,850 on October 2, 1934, and that the incumbrances upon 26–28 Rollhaus place had increased from $10,500 on the first date to $15,000 on the second date. The statements afford no adequate explanation of such increases aggregating $7,850. Nor does it appear what became of the money. This information was not disclosed by the bank. From the various facts above referred to various other inferences of the same nature might very well be drawn. It is sufficient to say that the record shows conclusively that there was not a full and frank disclosure by the bank to the defendant of all of the material information in the possession of the bank with respect to the risk to be insured against. For that reason, the complaint must be dismissed upon the merits. It will be so adjudged.

*Sixth.* The defendant pleads also a counterclaim for cancellation or reformation of the policy. This amounts to nothing more than a repetition of the various matters pleaded as a defense, and to which a reference has been made. The policy has an independent status so far as it applies to the $2,800 mortgage still in existence. The defendant is not entitled to rescission on the theory of a material misrepresentation, etc. It has neither repaid, tendered or offered to return the premium paid for the policy. Nor is there any basis for a reformation. There is nothing to indicate that by mutual mistake of both parties, or by a mistake of the defendant and fraud of the plaintiff, etc., the policy was drawn to cover a risk which the defendant did not intend to insure. So far as appears, the policy was drawn in the form that both parties intended it to be. There is nothing about it to be reformed. The counterclaim is dismissed upon the merits.

Settle findings and judgment upon two days' notice. The testimony and all exhibits submitted have been forwarded to the clerk at Special Term, Part I, White Plains, where they may be withdrawn by the respective counsel entitled thereto.