## HOME FEDERAL SAVINGS AND LOAN ASSOCIATION *v.* SPENCE ET AL.

[No. 107, September Term, 1970.]

*Decided November 13, 1970.*

576

The cause was argued before HAMMOND, C. J., and MC-WILLIAMS, FINAN, SMITH and DIGGES, JJ.

*Richard F. Cadigan* for appellant.

*Kenneth J. Mackley,* with whom were *Ottinger, Mackley & Gilbert* on the brief, for appellees.

MCWILLIAMS, J., delivered the opinion of the Court.

In this litigation, a by-product of the duplicity of a Washington County developer, a client seeks to recover damages from an attorney because, says the client, the attorney has been negligent. What happened will more easily be recounted and more readily understood if, first, we identify the participants.

| | |
|---|---|
| Home Federal— | The appellant, Home Federal Savings and Loan Association, 122 West Washington Street, Hagerstown, Washington County. |
| Spence— | R. Noel Spence, an appellee, a member of the law firm of Kaylor, Spence and Hovermale, also appellees. We shall treat Spence as the only appellee. He has practiced law in Hagerstown since 1960. Home Federal, from time to time, beginning in 1964, employed him to examine titles and conduct settlements. |

| | |
|---|---|
| Miller— | Franklin R. Miller, in 1965, after 35 years of service, the executive vice president of Home Federal. |
| Funkhouser— | E. N. Funkhouser, the president of Home Federal in 1965. Later he became chairman of the board. He had been a director for 50 years. |
| Mobley— | E. Leister Mobley, in 1965, was a director of Home Federal and a member of its executive committee. At the time of trial, 1969, he was the president. |
| Stouffer— | Herman F. Stouffer, a developer and builder. He carried on his business in Washington County, F r e d e r i c k County, and the Pennsylvania counties of York and Franklin. |
| Holiday— | Holiday Acres, Inc., a corporation wholly owned by Stouffer. |
| Stains— | George Stains and Lois, his wife, contract purchasers from Holiday of an improved lot on Mohawk Drive in Greenvale Village. |
| Eyler— | Curtis L. Eyler and Ruth Y., his wife, purchasers from Holiday of an improved lot on Mohawk Drive in Greenvale Village. |
| Norris— | Edward E. Norris and Barbara L., his wife, purchasers from Holiday of an improved lot on Ottawa Drive, Greenvale Village. |
| Hartman— | Donald Hartman and Katherine A., his wife, contract purchasers from Stouffer of an improved lot on Ottawa Drive, Greenvale Village. |

Of Stouffer's activities prior to 1960 the record tells us nothing except that Miller had known him as early as 1957. From 1960 on Stouffer's business seems to have

flourished and he was thought to be a great success. On many occasions Home Federal loaned him money to buy properties and to build houses. In the years between 1960 and 1965 he enjoyed the respect and confidence of Miller who considered him one of Home Federal's best customers. Miller customarily acted for Home Federal in its dealings with Stouffer. No doubt much of Miller's confidence in Stouffer's integrity and stability was generated by financial statements Stouffer had filed with Home Federal, suggesting a net worth of nearly $2,000,-000. And too there is in the record evidence of private transactions between them suggesting that Miller may have been under some obligation to Stouffer.

The record does not reveal the reasons for Stouffer's downfall but it is clear that in the late spring or early summer of 1965 his "empire" began to come unstuck. The first visible symptom was a shortage of cash which he undertook to alleviate by an elaborate scheme for the kiting of "rubber" checks. We shall not prolong this opinion by reciting the details of his knavery. That he got by with it, even for a time, was due in large part either to Miller's incredible gullibility or to his childlike faith in Stouffer's stability, or perhaps to both. In either case, by mid-October Stouffer had gotten $166,635.66 from Home Federal and it had nothing to show for it except a clutch of worthless checks.

When Miller realized that Stouffer was not noticeably interested in settling up he became somewhat uneasy. He pressed Stouffer to redeem the checks or else come up with some collateral. Stouffer offered only promises none of which he kept. His faith shaken and no doubt thoroughly frightened, Miller went to Funkhouser, both friend and protector it seems, and related the melancholy details of his predicament. They decided to keep mum in respect of the other directors and together they went after Stouffer. It can be inferred from the record that Stouffer had neither the cash to redeem the checks nor any unencumbered property with which to secure their payment. They learned, however, that he held contracts

of sale on houses he had sold some months earlier, at least four of which were subject to construction mortgages. Stouffer agreed to hand these over to Miller and Funkhouser, probably because the contracts were not otherwise readily marketable except at a heavy discount, if indeed they were marketable at all. The immediate assignment of the contracts was obviously the easiest way to acquire Stouffer's equity therein. Why this was not done the record does not disclose. A probable explanation is that Miller (and Funkhouser) knew the directors would take a very dim view of such an arrangement if it ever came to light. They wanted cash and they hit upon a scheme to provide it. Stouffer agreed to cooperate.

Stouffer, carrying out his part of the scheme, went to his purchasers, nine in all, and told them Home Federal would loan each of them enough money to enable each one to obtain the title to his property. He saw to the filing of the applications for a loan and Miller shepherded them through Home Federal's routine. Early in December Miller forwarded the applications to Spence for title examination and settlement and, at the same time, he notified each applicant to get in touch with Spence and arrange for settlement. Stouffer had assured Miller that he would see to the release of the construction mortgages so that Home Federal would wind up with first liens. The amount of each loan would then be sent back to Home Federal by Spence and applied by Miller to the liquidation of Stouffer's checks and then, barring bad luck, the entire contretemps could be swept under the rug.

We shall be concerned with only four of the properties and we think it will be less confusing if we discuss them separately.

## STAINS

Just when Holiday became the owner of this lot the record does not reveal. It is quite clear, however, that in February 1965 Holiday borrowed $15,600 from Home Federal to build a house on it. Miller himself inspected the house on 8 September and immediately thereafter au-

thorized the disbursement of the remaining balance of the $15,600 construction loan. Neither the date of the sale from Holiday to Stains nor the purchase price is discernible from the record. Indeed the whole transaction seems a bit daft. Stains applied for a loan of $15,500 to purchase his property. He stated in his application that there was a $15,000 mortgage already on the property. Miller, however, insisted that, although he concurred in the directors' approval of Stains' application, he did not know that Home Federal already had a $15,600 mortgage on the property. Of course, Stouffer promised Miller he would secure the release of the construction mortgage but, we suspect, he had no intention of doing so. Spence, after conducting the settlement and recording the deed and mortgage, returned the $15,500 to Miller along with a letter, dated 16 December, certifying that the Stains' mortgage was "a valid and subsisting first lien."

## EYLER

In Eyler's application for a loan of $17,900 the stated purpose was to "pay off a mortgage." The mortgage, on which there was a balance of $7,800, was dated June 1961. In its brief Home Federal insists that Eyler applied for a loan "to purchase [his] property." The very odd thing here is that Eyler obtained a deed to his property from Holiday on 12 August 1965. Obviously he still owed Holiday or Stouffer around $10,000. We can only guess that Holiday or Stouffer held his note and that it represented a part of the purchase price of his house. Since Miller testified to an "understanding" that whatever was required to pay off the 1961 mortgage "would come from Stouffer and not from" Home Federal, we must assume that he was aware of its existence. Spence, as directed, returned the $17,900 to Miller and certified the mortgage to be a valid and subsisting first lien.

## NORRIS

Norris, like Eyler, obtained his deed from Holiday on 12 August 1965. He stated in his application that the pur-

pose of the loan was "to pay off a mortgage" but Home Federal, in its brief, again insists that the purpose was "to purchase the property." Norris asked for a loan of $20,500 and since the balance due on the 1961 mortgage to Weaver Brothers was about $11,500, it can be assumed he owed Holiday or Stouffer about $10,000. The same assumption that Miller was aware of the existence of the construction mortgage must be made because he testified that "it [was his] expectation on this mortgage that Mr. Stouffer would produce the funds to pay off the balance." Spence returned the $20,500 to Miller along with the certification that Home Federal's mortgage was a valid first lien.

### HARTMAN

Hartman purchased his lot from Stouffer who, in July 1965, had encumbered it with an $11,700 mortgage to Loyola Federal Savings and Loan Association. The purchase price and the terms of the sale to Hartman are not in the record. Hartman applied to Home Federal for a loan of $17,600. Spence, after the closing, returned the $17,600 to Miller, with the same certification. A few months later Loyola foreclosed its mortgage. Home Federal bought the property at the foreclosure sale for $13,100. Subsequently it sold the property for $17,600. What follows is an excerpt from the cross-examination of Miller:

> "Q. Would you recollect, Mr. Miller, testifying in deposition to the effect that actually Home Federal wound up with about even with the board on Hartman? A. Yes sir.
>
> "Q. In other words, after application of the pledged savings account on the Hartman mortgage loans and the consequent resale of the property, Home Federal came out even, give or take a couple of dollars? A. Yes sir."

While the record is far from clear in this regard it does appear that Hartman, before the foreclosure, gave Home

Federal a deed for his property and that his mortgage to Home Federal was released when it sold the property.

Although Miller insisted he was not aware of it, Spence had represented Stouffer in various matters for several years before 1965. He said Stouffer, in the beginning, "was in a rather tight financial situation." Later, he continued, Stouffer "apparently became very successful in his business ventures, and became a very substantial developer." On a number of occasions he disbursed funds "upon Mr. Stouffer's assurance" that the release [of the construction mortgage] would be forthcoming," and the release always arrived "within a few days." Spence said he knew the construction mortgages on the four properties had not been released of record. He did not mention this in his certifications because, he said, he

> "spoke to Mr. Stouffer in regard to the securing of these releases and * * * [he] was assured by him that checks had either already been sent to secure them or that the releases would be secured by him and delivered to * * * [Spence] for recording."

Spence was entirely ignorant of Stouffer's "precarious" financial condition and, he said, he had no reason to suspect that Stouffer was other than the successful, substantial business man he believed him to be. He recalled that Miller had instructed him to return "*all* of the money" (emphasis added) and "to hold the settlements as soon as possible." He thought nothing of this because Stouffer had often been "in a hurry for settlement" and Stouffer apparently was agreeable to the return of the proceeds of the loans to Home Federal. Miller said nothing to him about Stouffer's bad checks nor did he mention anything about Stouffer's promise to obtain releases of the existing construction mortgages.

Home Federal subsequently paid out $7,851.93 to obtain the release of Weaver Brothers' mortgage on the Eyler property and $11,490.27 for the release of the mortgage on the Norris property. As has been noted $13,100

was paid for the Hartman property and $15,549.11 was due on the mortgage from Holiday to Home Federal on the Stains property. These four amounts totaled $47,-991.31. The Federal Home Loan Bank people upon discovering that this amount had been written off as a loss insisted that suit be filed against Spence to recover it. No effort was made to recover anything from Miller; indeed Mobley testified it was his belief both in 1965 and at the time of trial that "Miller was not responsible for any loss to Home Federal."

The suit against Spence was filed on 28 May 1968 in Carroll County by agreement. The case came on for trial before the court on 12 and 13 November 1969. The trial judge, Weant, J., relying upon *First National Bank and Trust Co. of Port Chester v. New York Title Ins. Co.,* 12 N.Y.S.2d 703 (Sup. Ct. 1939), was of the opinion "that an attorney called upon to make title examinations is entitled to the same disclosure of material facts as would be a title insurance company." He held Home Federal to be "guilty of contributory negligence in failing to disclose [to Spence] various material matters known to it." He went on to say:

> "We might add that we believe that the plaintiff, realizing its non-disclosure had compounded its original negligence, would not have attempted to use Attorney Spence as a scapegoat except for the fact that they were forced to do so at the insistence of the Federal auditors upon the discovery of the loss which had been suffered.
>
> "Since we have concluded that the plaintiff cannot recover by reason of its contributory negligence, we do not now find it necessary to consider the question of damages. We do entertain some serious doubt as to the amount thereof, however."

He entered a judgment for costs in favor of Spence and his partners.

We shall affirm the judgment below but not for the

reason given by Judge Weant. He found it unnecessary "to consider the question of damages" but, had he done so, we think he might have reached the same result we now reach.

Because Miller forgot the ancient maxim, "Good it is to shette the stable before the hors be lost," [1] Stouffer was able to make off with the money; and upon this unhappy circumstance, in large part, we must rest our decision. Quite obviously then, in November 1965 Miller and Funkhouser were engaged in nothing more than a salvage operation. They must have surmised, if they did not already know, how desperate was the likelihood that Stouffer still had available assets respectable enough for their purpose, if in fact he had any at all. We have found in this record nothing to suggest there was available anything other than Stouffer's equities in the nine properties. The inference is strong, probably irrefutable, that theirs was indeed a Hobson's choice. In these circumstances it seems clear to us that Miller and Funkhouser were in no position to impose conditions. They could not say to Stouffer that the properties would not be acceptable unless he cleared away the liens. They were going to have to take them anyway and they could only hope that Stouffer, as he promised, would get the releases. This is why we find it difficult to perceive how Home Federal's position was worsened because Spence did not report to Miller what Miller must have known. Miller should have been anxiously concerned about the release of those mortgages because the amounts of the loans to the nine lot owners had been carefully tailored to Stouffer's total debt. But, on the other hand, it would have been very naive of him to have expected that Stouffer would be able to raise the $48,000 in cash necessary to release the mortgages or that, had he been able to do so, he would have used it for that purpose. Considering all of the circumstances and assuming Miller actually read Spence's certifications, one wonders why he did not telephone imme-

---

1. Jean D'Arras, *Melusine* (c. 1500).

diately to Spence to find out if Stouffer really had effected the release of the mortgages. It would have been very good news indeed and if true he could have relaxed; his troubles would have been over. But, of course, Spence would have told him only that Stouffer had promised to see to it and that would not have been news to Miller. It was asserted during oral argument before us that if Spence had reported the outstanding mortgages Home Federal could have refused to make the loans. We must agree that it could have done so but it is clear, we think, that by so doing it would have acted contrary to its interests. Absent a showing that it had other strings to its bow we must assume that it would have elected to make the loans anyway. After all, half a loaf—.

We think the law is settled that before an attorney can be held liable, it must appear that the loss for which he is sought to be held *arose* from his failure to discharge some duty which was fairly within the purview of his employment, *Watson v. Calvert Building and Loan Association,* 91 Md. 25 (1900), and that it must be shown how the plaintiff was deprived of any rights or parted with anything of value, *in reliance* upon the statements or omissions in his certificate, *Williams v. Hanley,* 45 N.E. 622 (Ind. 1896). In 1 Am.Jur.2d, *Abstracts of Title,* §§ 19 and 26, it is said that an "abstractor is not liable for losses incurred otherwise than in reliance on the abstract," and that his liability extends only to losses "directly resulting from, or proximately caused by, his breach of duty to furnish a correct abstract." *See also Beckovsky v. Burton Abstract and Title Co.,* 175 N. W. 235 (Mich. 1919), and 1 C.J.S., *Abstracts of Title,* § 11d. Home Federal insists that its cause of action against Spence arose immediately upon the submission of his erroneous certifications and that the proper measure of damages is the amount ($47,991.31) it had to pay out to put itself in a "first lien position." It cites in support of its contention a number of decisions, most of which are either mentioned or discussed in *Reamer v. Kessler,* 233 Md. 311 (1964), and more recently in *Mumford v. Sta-*

*ton, Whaley & Price,* 254 Md. 697 (1969). It leans heavily upon an 1897 decision of the Supreme Court of Pennsylvania, *Lawall v. Groman,* 180 Pa. 532, 37 A. 98, which it declares was cited with approval in *Watson v. Calvert Building and Loan Association, supra;* in *Wlodarek v. Thrift,* 178 Md. 453 (1940) ; and in *Corcoran v. Abstract and Title Company of Maryland, Inc.,* 217 Md. 633 (1958). We have read and re-read the opinions in those cases, including the dissenting opinion of Judge Prescott (later Chief Judge) in *Corcoran,* but we have been unable to find therein any mention whatever of *Lawall v. Groman, supra.* It was mentioned, however, in *Reamer v. Kessler, supra.* Chief Judge Brune, for the Court, said:

> "As was said in a mortgage case, *Lawall v. Groman,* 180 Pa. 532, at 540, 37 A. 98, 57 Am. St. Rep. 663: 'Plaintiff is entitled to the security she contracted for, and may recover the difference in value between that and what she actually got.' " *Id.* at 317.

We think Home Federal's reliance upon *Lawall* is misplaced. There Mrs. Lawall took a mortgage to secure a loan. It was a run-of-the-mill transaction in which she advanced money on the strength of Groman's title certification which, it turned out, neglected to report a prior lien. It was argued that "inasmuch as she took the mortgage as security only, and the mortgagor, when called upon, may pay the debt, or, the mortgage being sued out, the property may bring enough to cover it" (37 A. at 99), and thus until then no damage has been suffered. The Pennsylvania court rejected Groman's argument. We take no position in respect of the propriety of its action, however, because the situation in the case at bar is significantly different from the situations in *Lawall* and in the decisions cited by Home Federal.

We are not concerned here with the commonplace transaction in which a lender or a purchaser, relying upon an attorney's certificate, makes an irrevocable commitment. Home Federal had been $166,635.66 out of pocket for

several months before Spence was directed to examine the titles and to conduct the closings. Furthermore the entire proceeds of the four loans, $71,500, were sent back to Home Federal. Spence was not told why he was directed to do this nor was he told to what use Home Federal intended to put the money. In the circumstances we are reluctant to say that Spence was altogether remiss in relying on Stouffer's assurance that he would send him the releases. After all Stouffer had established his integrity and reliability with Spence. Had Miller told him what was in the wind it is hardly likely Spence would have neglected to tell him that his certificate was based on Stouffer's promise to obtain the releases. Judge Weant thought it to be "unquestioned that Attorney Spence would not have honored" Stouffer's promise "had he known of these activities." He thought it to be "unquestioned" also that, instead of certifying the titles "he would have informed" Miller of the outstanding mortgages. Nevertheless he felt "Spence was undoubtedly negligent in failing to report the outstanding mortgages." In this regard we agree with Judge Weant.

As we have intimated, we have found in this record no evidence that Home Federal acted or chose not to act in reliance upon Spence's certifications. Indeed, had that been the case, one might have expected that Spence would have been called upon to set things to rights. He was not called upon to do anything; he was not consulted in respect of the purchase of the Hartman property, or the release of the mortgages on the Norris and Eyler properties, or the release of Home Federal's own mortgage on the Stains property; the "loss" was charged off and the episode forgotten until representatives of the Federal Home Loan Bank insisted that Spence be sued.

Since we hold that Home Federal has not shown that it parted with anything of value or that it was deprived of any rights in reliance upon Spence's certification it is unnecessary for us to consider the interesting question whether Home Federal was contributorily negligent and whether it could be said in any case that an actual loss

had occurred in respect of the Hartman and Stains properties.

*Judgment affirmed.*
*Costs to be paid by appellant.*