**DALLAS TITLE AND GUARANTY COMPANY, Appellant,**

v.

**Hattle VALDES, Appellee.**

No. 11698.

Court of Civil Appeals of Texas.

Austin.

July 30, 1969.

Rehearing Denied Oct. 1, 1969.

Small, Herring, Craig, Werkenthin & Shannon, C. C. Small, Jr., Austin, for appellant.

Maloney, Black & Hearne, Douglass D. Hearne, Austin, for appellee.

O'QUINN, Justice.

This is a suit brought against the grantor and the insurer of title for breach of general warranty contained in a deed to real estate.

From a judgment after trial before the court awarding the grantee recovery of $12,000 from the grantor and the insurer jointly, the insurer has appealed and assigns eight points of error. The grantor did not appeal.

The principal question is whether the "correct survey" exception in the title policy relieved the insurer of liability.

We affirm the judgment of the trial court.

By general warranty deed dated August 14, 1964, John Flanagan purported to convey to Hattie Valdes, the appellee, real property described as:

"All of Lot 9, Block G, Summit Oaks Subdivision fronting on U.S. 183 Expressway and being the same as lot 9 in Plat Book 7, Page 183, Travis County Plat records and same fronting about 140 feet on said expressway."

On the same date Dallas Title and Guaranty Company, appellant, issued a title policy in the sum of $12,500 guaranteeing "to Hattie Valdes * * * that she has good and indefeasible title to the" property described in the deed from Flanagan. The policy stated that it was subject to "Any descrepancies [sic], conflicts, or shortages in area or boundary lines, or any encroachments, or any overlapping of improvements which a correct survey would show."

The lot described in the deed is shown by the plat of the subdivision to be a five-sided parcel of land having dimensions of 175 feet, 219.08 feet, 135 feet, 60 feet, and 191.66 feet. Some time after the conveyance from Flanagan to appellee, Mrs. Valdes discovered upon personal inspection that most of the lot was occupied by U.S. Highway 183. At the trial it was shown that the portion of the lot not under the highway consisted of a strip of land about 135 feet long with a depth ranging from fifty-three feet at one end to about thirteen feet at the other. The lot as originally laid out in the subdivision contained 39,248 square feet, of which 35,315 square feet had been incorporated in the highway right-of-way after condemnation proceedings tried in Travis County by which the State of Texas had acquired title to about nine-tenths of Lot 9.

The position of Appellee Valdes is that Flanagan conveyed Lot 9 to her under a general warranty for a consideration of $12,500 and that Flanagan did not have good and indefeasible title to the land described in the deed because only a relatively small portion of Lot 9 lay outside the highway right-of-way, and consequently the warranty was breached. Appellee contends the title policy issued by appellant guaranteed her good and indefeasible title to the property described in the deed.

Appellant's position is that the guarantee of good and indefeasible title was subject to the "correct survey" exception, and that there was no failure of title to the land described in the deed and therefore no liability exists under the title policy.

A qualified appraiser testifying at the trial stated that the small strip of land lying outside the right-of-way, consisting of about 3933 square feet, had a fair cash market value of $500 on the date the deed was made. In awarding recovery of $12,000 to Mrs. Valdes, the trial court found that the difference in market value of Lot 9 as guaranteed by the title company and the tract as reduced by that portion "to which title failed was the sum of $12,000."

Under the first three points of error, the title company seeks to avoid liability under the policy under its contention that the de-

scription of the land contained in the deed of August 14, 1964, limited the conveyance, and the company's liability, to that portion only of Lot 9 lying outside the highway right-of-way. This contention is in direct conflict with the undisputed good faith intention of Flanagan to convey, and of Mrs. Valdes to buy, all of Lot 9. The contention is also contrary to the description of the lot contained in both the deed and the title policy.

The trial court made findings of fact, among which were findings:

1) That when Flanagan conveyed to Mrs. Valdes on August 14, 1964, he represented in good faith that she was acquiring all of Lot 9, described orally by Flanagan as a commercial lot, about 150 feet by 200 feet, facing on the highway, and that Mrs. Valdes relied on the representations;

2) That Flanagan received the property from David L. Tisinger, under the same description found in the deed from Flanagan to Mrs. Valdes, by deed dated August 3, 1964, followed on August 13, 1964, by a second deed describing the property without reference to Highway 183.

3) That Flanagan had seen a plat of the subdivision as recorded, with the highway drawn across the plat so as to represent that its northern boundary coincided with the southern boundary of Lot 9, leaving Lot 9 intact.

4) That at the time of conveyance from Flanagan to Mrs. Valdes, she intended to purchase Lot 9 as shown by the plat records, and at that time Mrs. Valdes had not seen the property "on the ground."

The evidence sufficiently supports these findings.

The title company contends that the "deed does not convey and does not purport to convey any portion of Lot 9 which lies within the right-of-way of U.S. Expressway 183" and that the company's "liability is limited solely to the tract of land conveyed by such deed." In this connec-

tion appellant argues that the "controlling portion of the description contained in the deed appears in these words:

"'*All of Lot 9*, Block G, Summit Oaks subdivision *fronting* on U.S. 183 Expressway * * * and *same fronting about 140 feet* on said Expressway.'" (Emphasis by appellant).

"This language," the title company urges, "refers to frontage on the Expressway, not the entire lot. The words 'fronting' locate the tract conveyed in relation to the expressway and excludes any part of the lot which does not front on the expressway right-of-way."

■ We do not agree with this contention. The deed recites conveyance of "All of Lot 9 * * * and being the same as lot 9 in Plat Book 7, Page 183 * * *." The description of the lot as one fronting on the highway is inaccurate, and following as it does an accurate and definite description of Lot 9, the language referring to highway frontage must be rejected. Haley v. Murray, 177 S.W.2d 333, Tex.Civ.App., Austin, writ ref. w. o. m. (1944); Texas Pacific Coal and Oil Company v. Masterson, 160 Tex. 548, 334 S.W.2d 436 (1960). Identification of Lot 9 in Block G in the named subdivision as recorded in appropriate public records is specific, accurate, definite, and without ambiguity, in both the deed and the title policy.

■ The reference to frontage on the highway becomes inexact and indefinite by the language "about 140 feet on said expressway," and the addition of this phrase should not be permitted to limit or impair a preceding description that is definite and certain. Texas Pacific Coal and Oil Co. v. Masterson, supra. The title company relies upon the holding in Edwards v. Edwards, 52 S.W.2d 657, Tex.Civ.App., Austin, writ ref. (1932), in arguing that "all the words in a description are presumed to have been used advisedly and for a purpose, absent any apparent intention to the contrary."

In Edwards v. Edwards the language construed did not pertain to the description of property conveyed, but was language found in the habendum clause, the question being whether the deed manifested an intention to convey a separate estate in the land to the grantee, or vested title in him for "use of the community." The language in the latter part of the habendum clause restricting the use of the land to the grantee, to the exclusion of the community estate, was not inconsistent with other language employed. The court concluded that the "general rule that every word in a deed * * * must be given effect *where not inconsistent with other language employed* should apply." (Emphasis added). 52 S. W.2d 657, 660, col. 1.

■ If there is any doubt as to the meaning of the language in the description, and we do not find that an ambiguity exists, the established rule that the grantee is favored must be applied. 19 Tex.Jur.2d Deeds, sec. 110, p. 398, and cases cited. The rule is applicable to quantity of land conveyed, " * * * and that construction is preferred that will give the grantee the greatest quantity of land consistent with any provision of the deed." 19 Tex.Jur.2d Deeds, sec. 155, p. 473; Hunt v. Evans, 233 S.W. 854, Tex.Civ.App., Austin, writ ref. (1921); Roswurm v. Sinclair Prairie Oil Co., 181 S.W.2d 736, Tex.Civ.App., Fort Worth, writ ref. w. o. m. (1944).

The trial court found that the title to Mrs. Valdes in Lot 9, Block G, "failed by virtue of ownership of almost the entire lot by the State of Texas." The title company urges that its guarantee of indefeasible title was subject to the "correct survey" clause of the policy, and that since a "correct survey" would have shown the encroachment by the highway, the company is relieved of liability for the loss sustained by Mrs. Valdes.

The evidence established that a correct survey made on the ground disclosed no conflict or discrepancy between the survey and the description of record for Lot 9 as incorporated in the deed and the policy. W. Harvey Smith, a registered public surveyor, testified that he had surveyed the property and prepared a plat from his survey, which is in the record. Smith testified that if asked to make a correct survey of the land described in the deed, the survey would show all of Lot 9, Block G, as shown on the original plat records, since there was nothing contained in the description to indicate an encroachment by the highway and showed no discrepancies or shortages in boundaries or areas.

We quote from the Smith testimony:

"Q * * * if you were asked to make a correct survey of Lot 9, Block G, according to map or plat of that Subdivision * * * [as recorded in public records] and using that alone, what would your survey show?

A Well, of course, my survey would show, if I were asked to go out and survey all of Lot 9, Block 'G' as it is upon the ground, my survey would show exactly what I have right here, because I would find when I went to the ground, on the ground, I am sure that the first thing that would happen, my field party would call back in and say, 'Something is wrong; somebody has given us the wrong description,' and we would immediately seek more information or call the individual that ordered the survey and ask them if this is what they ordered. Of course, this would be the first reasonable thing to do. But, then, if someone insisted that I go ahead and survey Lot 9, Block 'G,' the results would be the same as what I have right here.

Q It would show the entire Lot 9 * * *

A Right.

Q * * * as shown on the original plat records?

A Right, with the highway encroaching on it."

The boundaries of Lot 9, Block G, of the subdivision are not in dispute. This controversy arose from the fact that when Flanagan conveyed Lot 9 to Mrs. Valdes and the title company insured the title, nine-tenths of the lot was not owned by Flanagan but title to that portion was in the State of Texas, which was a matter of public record.

As applied to the property intended by Flanagan and the title company to be insured, the survey which showed Lot 9 to be as described in the recorded plat, including that part owned by the State in the highway, "was a 'correct survey' within the purport and intent of the policy." Lawyers Title Insurance Corporation v. McKee, 354 S.W.2d 401, Tex.Civ.App., Fort Worth, no writ (1962). The "correct survey" exception in the McKee case is identical with the provision in the policy before us. In that case the title company contended that a correct survey would have shown that the land received by the insured did not include two acres owned by other persons. In the case at bar the title company contends that a correct survey would have shown that the land conveyed to Mrs. Valdes did not include the 35,315 square feet owned by the State and used as a highway.

In Chanoux v. Title Insurance Co., 258 S.W.2d 866, Tex.Civ.App., El Paso, writ ref., n. r. e. (1953), the title company contended that because the parties believed the true boundary between Lots 12 and 13 was where a stone wall had been located, there was a discrepancy in boundary that a correct survey would have shown. The court met this contention with language having application also to the facts of our case:

"There may have been a dispute or controversy as to the true boundary between Lots 12 and 13, but a correct survey at the time the policy was issued would have shown the true boundary of Lot 12 as reflected by the deed and title policy to be exactly where it is and has always been. True, it would have shown that the garage and improvements which the parties thought were on Lot 13 were in fact on Lot 12, but this would not have shown *any discrepancy in the boundary or area* of Lot 12 *as described in appellant's deed and policy.*" (Emphasis added). 258 S.W.2d 866, 867, col. 2.

We conclude that it is manifest from the policy that the title company intended to insure title to Lot 9 as it appeared in the public records, even though search in all probability would have revealed prior conveyance of nearly all the lot to the State for a highway. The terms of the policy are to be construed liberally in favor of the insured. Houston Title Guaranty Company v. Fontenot, 339 S.W. 2d 347, Tex.Civ.App., Houston, writ ref. n. r. e. (1960); American Fidelity and Casualty Co. v. Williams, 34 S.W.2d 396, Tex. Civ.App., Amarillo, writ ref. (1931).

Points 1, 2, and 3 are overruled.

By points 4, 5, 6, and 7, the title company asserts error of the trial court in fixing damages of $12,000 under the title policy. The company's liability under the policy is limited to "actual monetary loss" suffered by the assured, in no event to exceed $12,-500. The policy also provides a formula for computing liability when less than the whole of the property is lost. In such event, " * * * liability of the company shall be only such part of the whole liability limited above as shall bear the same ratio to the whole liability that the adverse interest claim or right established may bear to the whole property, such ratio to be based on respective values determinable as of the date of this policy."

A qualified appraiser testified that the sliver of land lying outside the highway right-of-way had a fair cash market value on the date of deed of $500, and that Lot 9

as shown by the subdivision plat at that time would have sold for $1,500 to $2,000.

The title company argues that Mrs. Valdes paid more than the market value of the lot at the time, and that although there was testimony that the actual consideration for the lot was $12,500, this would not mean that such amount was the actual market value of the tract at the time. If the market value of Lot 9 at the time of the deed was $2,000, the company contends that the monetary loss suffered by Mrs. Valdes was $1,500, since the sliver remaining was worth $500. "Her monetary loss," the title company insists, "is measured by the market value of what she supposedly lost at the time of loss, not by the price she might have paid for it."

The testimony of Flanagan and Mrs. Valdes is uncontroverted that the consideration paid in cash by Mrs. Valdes for Lot 9 was $12,500, and the trial court so found.

The policy provides that the formula prescribed for computing liability, when less than the whole of the property is lost, is "to be based on respective values determinable as of the date of the policy." The identical computation clause was construed in Lawyers Title Insurance Corporation v. McKee, supra, and the method there used was followed by the trial court in this case. The title company contends, however, that the figure of $2,000, the total value of Lot 9 suggested by the appraiser, be used in the formula, instead of the actual consideration of $12,500 paid by Mrs. Valdes for the lot.

It was established without contradiction that failure of title to that part of Lot 9 owned by the State left Mrs. Valdes with a sliver of land worth $500. Mrs. Valdes was insured to a limit of $12,500 for monetary loss suffered by her by reason of failure of all or any part of the title. We find nothing in the policy requiring the insured, in arriving at her monetary loss, to establish first that the price she paid for the lot was its fair cash market value.

Points 4 through 7 are overruled.

Under the eighth and last point of error, the title company contends that the trial court should have allowed the company benefit of all money repaid Mrs. Valdes by David Tisinger on account of the conveyance to her from Flanagan.

The record shows that there was an arrangement between Tisinger and Flanagan, by which Flanagan would convey to Mrs. Valdes property deeded to him by Tisinger, with a collateral oral "buy-back" agreement with Mrs. Valdes that within a specified time she could re-convey the property for more money than she paid for it. At least one such trade was completed, under which Mrs. Valdes paid $10,000 for property and a short time later received $11,000.

At the time of the conveyance of Lot 9, Mrs. Valdes paid Flanagan $12,500 for Lot 9, together with an additional sum of $7,500, represented to be the value of Lot 3, Block A, which was a tract to which Mrs. Valdes already had a deed dated some nine days earlier than the deed to Lot 9. Lot 3, Block A, had been involved in the earlier trade, and Flanagan had left the deed with Mrs. Valdes when he paid her the $11,000. Mrs. Valdes paid the consideration of $12,500 and $7,500 in one check for $20,000.

Subsequent to these transactions and after the "buy-back" arrangement did not go through, Mrs. Valdes received from Tisinger the sum of $2,500 in cash and checks and the further sum of $675 from Flanagan in three payments of $225 each. The payments from Tisinger were delivered to Mrs. Valdes by an intermediary or by deposit to her bank account. The testimony is without dispute that Tisinger at no time specified how the payments were to be applied and that Mrs. Valdes applied all the payments, aggregating $3,175, to the "buy-back" agreement with respect to Lot 3, Block A, which she had acquired for $7,500.

In the absence of instructions from Tisinger, there being no agreement on the subject, Mrs. Valdes had the right to make whatever application of payments she chose with respect to the several debts. The applications made by her do not show that they were inequitable or unjust to Tisinger. The rule we apply to the facts of this case is stated in 44 Tex.Jur.2d Payment sec. 34, pp. 688–9, and the cases cited. The eighth point of error is overruled.

The judgment of the trial court is affirmed.

Affirmed.