# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 14, 2014

Lyle W. Cayce
Clerk

Nos. 12-40692 & 12-40702

LAWYERS TITLE INSURANCE CORPORATION,

Plaintiff–Appellee

v.

DOUBLETREE PARTNERS, L.P.,

Defendant–Appellant

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LAWYERS TITLE INSURANCE CORPORATION,

Plaintiff-Appellee

v.

DOUBLETREE PARTNERS, L.P.,

Defendant

v.

CHRISTOPHER A. KALIS; JAMES EDWIN MARTIN,

Appellants

Appeals from the United States District Court
for the Eastern District of Texas

Before WIENER, DENNIS, and OWEN, Circuit Judges.

Nos. 12-40692 & 12-40702

PRISCILLA R. OWEN, Circuit Judge:

These two consolidated appeals arise from a title insurance coverage dispute between the insured, Doubletree Partners, L.P. (Doubletree), and its insurance company, Lawyers Title Insurance Corporation (Lawyers Title). Doubletree appeals the magistrate judge's grant of Lawyers Title's motion for summary judgment and denial of its cross-motion for summary judgment on Doubletree's breach of contract claims and extracontractual claims. Doubletree's attorneys, Christopher A. Kalis and James Edwin Martin, appeal the magistrate judge's award of attorneys' fees to Lawyers Title under 28 U.S.C. § 1927. We affirm in part and reverse in part the magistrate judge's order on the motions for summary judgment, and we reverse the magistrate judge's award of attorneys' fees to Lawyers Title.

I

The facts are for the most part undisputed. Doubletree is a limited partnership formed by real estate developer Fred Placke. Doubletree purchased a thirty-six-acre tract in Highland Village, Texas, with the intent to develop it into a luxury retirement community for seniors. The plan for the development included approximately eighteen multi-story buildings, each with multiple units, a community center, and other amenities.

In April 2006, Doubletree closed on its purchase of the property with the seller, Duncan Duvall, for $3.45 million. Doubletree and Duvall escrowed the sales contracts for the property with Lawyers Title.[1] In connection with the purchase, Doubletree acquired a title insurance policy from Lawyers Title. In

---

[1] More precisely, Doubletree and Duvall escrowed the sales contract for the property with Land America–American Title Company (American Title), who acted at all times as the title insurance agent for Lawyers Title. American Title was authorized to solicit, issue, and countersign title insurance policies on Lawyers Title's behalf and in its name. In this opinion, we will refer to Lawyers Title in all instances, including those in which American Title was acting on behalf of Lawyers Title.

addition, Lawyers Title offered to provide Doubletree "a more complete title insurance policy" that would insure "against loss because of discrepancies or conflicts in boundary lines, encroachments or protrusions, or overlapping of improvements, excluding from the coverage specific matters disclosed by the survey," if Doubletree obtained a survey of the property and paid an additional premium. Doubletree decided to purchase this more complete policy, and the parties have referred to the additional coverage Doubletree purchased as "survey coverage."

Located on Lake Lewisville, the property at issue is encumbered by a number of easements and restrictions, including the flowage easement, which is at the heart of this dispute. Granted in 1955, the flowage easement gives the United States the right to flood, overflow, and submerge areas of the property that lie below 537 feet in elevation. The easement also prohibits construction of any structures below that elevation without the written consent of the United States.

Lawyers Title issued several title commitments to Doubletree and its agents before issuing the title insurance policy itself. The final title commitment lists several encumbrances as exceptions from coverage, including the flowage easement, and also reflects Doubletree's purchase of survey coverage. The exceptions listed in the final title commitment are also referenced in the sales contract, the vesting deed, and the leaseback agreement Doubletree signed at the closing of the sale.

Before closing, Doubletree retained a professional surveyor, Mark Paine, to conduct a pre-closing survey. This original March 2006 survey indicated the approximate location of the flowage easement held by the United States, showing that it covered a relatively small portion of the property's southern edge. In conducting the survey, Paine relied on flood insurance rate maps. However, Paine did not measure elevations with respect to the flowage

easement, and he did not consult a publicly available contour map from the City of Highland Village.

Based on the original survey, Lawyers Title issued Doubletree's title insurance policy and provided the policy to Doubletree on April 18, 2006. Due to a software printing error, the original policy failed to include many of the encumbrances listed as exceptions, including the flowage easement. The original policy also failed to include the agreed-upon survey coverage. Several months later, in October 2006, Doubletree submitted a lost policy request. In response, Lawyers Title sent a copy of the policy that was identical to the original policy in all respects, including in its omission of the flowage easement exception and the survey coverage.

Meanwhile, Doubletree began its plans to develop the property. It retained an architectural firm to assist in the design and planning of the development on the property. Paine's company, G&A Consultants, assisted the architectural firm with engineering work. Both companies relied on the original survey to conduct their work. In an effort to comply with the restrictions on building within the flowage easement, the development plan reserved the area shown on the original survey as being covered by the flowage easement for landscaping and other green space.

As part of the development planning process, Doubletree sought a zoning change to accommodate the senior retirement community by submitting a zoning change application to the City of Highland Village. Not long after submitting the application, however, Doubletree discovered a serious error in the survey that halted development of the property: The survey substantially underrepresented the area of the property that was subject to the flowage

4

easement.[2]  The significantly larger no-building zone covered by the flowage easement meant Doubletree would be unable to proceed with its plan to build several of the residential structures it intended to build on the lakeside portion of the property.  Because of the impact of the error on its development plans, Doubletree withdrew its zoning application.

Doubletree then filed a complaint against Paine with the Texas Board of Professional Land Surveying.  The Board ultimately determined that Paine did not violate any professional standards while conducting the survey.  However, the Board noted that the location of the flowage easement to the United States was "substantially different from" the location of the easement shown on the documents on which Paine relied in drawing the survey map.  The Board explained that the "best practice" is to identify the documents relied upon by the surveyor, which Paine did not do, and that the survey "could be considered confusing" for that reason.  Despite this, the Board concluded the procedure Paine used "appear[ed] to be adequate" and, "[i]n lieu of further actions" by the Board, offered Paine the opportunity to sign an assurance of voluntary compliance with the Board's rules in the future.

In March 2008, Doubletree filed a title insurance claim with Lawyers Title. Doubletree alleged the existence of the flowage easement on the property caused $850,025 in damage from the diminution of the property's value for its intended purpose.  The claim did not rely on the error in the survey but instead relied on the original policy, which did not contain an exception for the flowage easement

---

[2] In a footnote in its opinion, the district court noted, "Doubletree has not proven that there was an actual error in the survey in the depiction of the Flowage Easement."  However, Lawyers Title effectively concedes there was some degree of error in the survey, since it provides a map showing the difference between the flowage easement as depicted on the survey and the flowage easement as field-measured.  There is thus no genuine dispute as to whether the location of the flowage easement as shown on the survey was incorrect to some extent.

and did not include a provision for survey coverage. In response, Lawyers Title denied the claim, explaining that, based on the title commitments, the flowage easement was meant to come within an exclusion to coverage under the policy.

In May 2008, Doubletree resubmitted the claim to Lawyers Title, again relying on the fact that the title policy contained no exception relating to the flowage easement, and insisting that the title commitment containing that exception was no longer in force. Lawyers Title again denied the claim, but this time it provided a corrected policy with the denial. The corrected policy included the flowage easement exception as reflected in the final title commitment, as well as the standard survey exception as amended to reflect the purchase of survey coverage.

By the time Lawyers Title sent its second letter denying Doubletree's claim, Doubletree had been unable to go forward with its development as planned and was eventually unable to meet its loan obligations on the property. The property was subjected to foreclosure proceedings and sold at a public auction to the Trust for Public Land, a conservation organization, in June 2009.

In July 2008, Lawyers Title filed suit against Doubletree in the United States District Court for the Eastern District of Texas, seeking a declaration of the parties' rights and obligations and reformation of the original policy. Lawyers Title also sought attorneys' fees. Doubletree counterclaimed for breach of contract, breach of the duty of good faith and fair dealing, violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Consumer Protection Act (DTPA), common law and statutory fraud, and negligent misrepresentation, seeking declaratory relief and damages. The parties consented to proceed for all purposes before a magistrate judge.

Following discovery, the parties filed cross-motions for summary judgment. The magistrate judge granted Lawyers Title's motion for summary

judgment and denied Doubletree's cross-motion for summary judgment. The magistrate judge's opinion reformed the title insurance policy to reflect the corrected policy issued by Lawyers Title. The magistrate judge further held that exclusion 3(a), which appeared in both the corrected policy and original policy issued by Lawyers Title, barred Doubletree's claim. According to the court, under exclusion 3(a), Doubletree "suffered, assumed or agreed to" the flowage easement as an encumbrance on title by accepting the final title commitment, the vesting deed, and the leaseback agreement, each of which referenced the easement. In addition, the magistrate judge held that, even under the corrected policy, the survey coverage purchased by Doubletree did not cover the survey error in identifying the easement; the type of title insurance Doubletree suggested it purchased is not available in Texas; and the exception for the flowage easement excluded the entire flowage easement from coverage in any event. For all of these reasons, the magistrate judge held that Doubletree could not recover on its breach of contract claim based on the title insurance policies.

In the same opinion, the magistrate judge held that Doubletree could not recover on its extracontractual claims. By separate order, the magistrate judge awarded Lawyers Title $55,310 in attorneys' fees against Doubletree's attorneys, Kalis and Martin, for their allegedly unreasonable and vexatious pursuit of Doubletree's extracontractual claims, pursuant to 28 U.S.C. § 1927. Doubletree appeals the decision on the summary judgment motions, and Kalis and Martin appeal the attorneys' fees award.

## II

We first address the standards of review and choice-of-law rules governing this dispute. We review the grant or denial of a motion for summary judgment

Nos. 12-40692 & 12-40702

de novo, applying the same standard as the district court.[3] Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[5] We also "consider all evidence in a light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party."[6]

Under Texas choice-of-law rules, Texas substantive law governs the breach of contract claims and extracontractual claims here.[7] "To determine state law, federal courts sitting in diversity look to the final decisions of the state's highest court."[8] If there is no final decision by the state's highest court on the issue, "it is the duty of the federal court to determine, in its best judgment, how the highest court of the state would resolve the issue if presented with the same

---

[3] *Trinity Universal Ins. Co. v. Emp'rs Mut. Cas. Co.*, 592 F.3d 687, 690 (5th Cir. 2010).

[4] FED. R. CIV. P. 56(a).

[5] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).

[6] *Frakes v. Crete Carrier Corp.*, 579 F.3d 426, 429-30 (5th Cir. 2009) (internal quotation marks and citation omitted).

[7] *See, e.g.*, *Sonat Exploration Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 233 (Tex. 2008); *Gutierrez v. Collins*, 583 S.W.2d 312, 318-19 (Tex. 1979); *see also Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *Erie R.R. v. Tompkins*, 304 U.S. 64, 78-80 (1938); *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003).

[8] *Canal Indem. Co.*, 352 F.3d at 260.

case."[9] Ultimately, if state law does not provide a ready answer, a court making an "*Erie* guess" will apply state methodology in resolving the issue.[10]

Finally, in considering an award of attorneys' fees under 28 U.S.C. § 1927, we review for an abuse of discretion.[11] "A district court abuses its discretion if it awards sanctions based on an erroneous view of the law or on a clearly erroneous assessment of the evidence."[12]

## III

Lawyers Title argues that the district court correctly reformed the policy. It contends that the parties had a prior agreement regarding both the flowage easement exception and the amended standard survey exception but that a computer software error resulted in a mistake in reducing the agreement to writing. For these reasons, Lawyers Title argues that, under the doctrine of mutual mistake, the policy was properly reformed.

Although Doubletree argues on appeal that the policy should not be reformed, it provides virtually no factual analysis of this issue and cites no relevant authority in support of its position.[13] In its briefing, Doubletree simply contends that reformation of a contract in favor of an insurer after an insured makes a claim, such that the policy precludes coverage, is unfair and contrary to public policy. It further argues that the summary judgment evidence did not

---

[9] *Id.*

[10] *Id.*

[11] *Cambridge Toxicology Grp., Inc. v. Exnicios*, 495 F.3d 169, 180 (5th Cir. 2007).

[12] *Id.* (internal quotation marks and citation omitted).

[13] Doubletree only cites *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663 (Tex. 1987), which holds that ambiguous insurance policies are to be interpreted in favor of the insured, *id.* at 666, and *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).

Nos. 12-40692 & 12-40702

establish that it made a mistake or engaged in any inequitable conduct warranting reformation.

Because it did not cite any supporting authority for its argument and did not develop the factual issues involved, Doubletree failed to brief the reformation issue adequately. As a result, it has waived this issue.[14] However, even if we were to consider the merits, we would conclude that the magistrate judge properly reformed the policy to reflect the corrected policy.

"The underlying objective of reformation is to correct a mutual mistake made in preparing a written instrument, so that the instrument truly reflects the original agreement of the parties."[15] To reform a written contract, the party seeking reformation must satisfy a two-part test: (1) an original agreement exists between the parties, and (2) a mutual mistake occurred, made after the original agreement, in reducing the agreement to writing.[16] "A mistake by only one party to an agreement, not known to or induced by acts of the other party, is not grounds for finding a mutual mistake."[17] However, a "[u]nilateral mistake by one party, and knowledge of that mistake by the other party, is equivalent to mutual mistake."[18]

---

[14] *N.W. Enters. Inc. v. City of Houston*, 352 F.3d 162, 183 n.24 (5th Cir. 2003) ("A litigant's failure to provide legal or factual analysis results in waiver."); s*ee also United States v. Demmitt*, 706 F.3d 665, 670 (5th Cir. 2013) ("As Demmitt has cited no authority in support of her contentions as to the [issue she raises], we hold this argument waived.") (citing FED. R. APP. P. 28(a)(9) ("The appellant's brief must contain . . . citations to the authorities[.]")).

[15] *Givens v. Ward*, 272 S.W.3d 63, 67 (Tex. App.—Waco 2008, no pet.) (emphasis omitted) (quoting *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379 (Tex. 1987)).

[16] *Id.*

[17] *St. Paul Lloyd's Ins. Co. v. Huang*, 808 S.W.2d 524, 527 (Tex. App.—Houston [14th Dist.] 1991, no writ) (citing *Johnson v. Snell*, 504 S.W.2d 397, 399 (Tex. 1973)).

[18] *Davis v. Grammer*, 750 S.W.2d 766, 768 (Tex. 1988).

Nos. 12-40692 & 12-40702

Here, the summary judgment evidence shows that an original agreement did exist between Doubletree and Lawyers Title. The final title commitment reflects agreement on the terms of the title insurance policy. That agreement included both an exception for the flowage easement and the survey coverage purchased by Doubletree. Further, the summary judgment evidence shows that Doubletree paid an additional premium to amend the survey clause to obtain survey coverage. Based on this evidence, the first part of the contract reformation test is satisfied.

The summary judgment evidence also reflects that Lawyers Title made a unilateral mistake in reducing the agreement to a final writing, and that Doubletree had knowledge of the mistake. As Lawyers Title explained, a software error resulted in the printing of the policy without including either the flowage easement exception or the survey coverage. Doubletree clearly had knowledge of this mistake since it paid a premium for survey coverage and received the final title commitment reflecting the coverage, but later received a policy from Lawyers Title that differed materially from the agreed-upon terms in the final title commitment. Indeed, the two title insurance claims Doubletree submitted to Lawyers Title were based on the original, flawed policy, and those claims noted that the policy it received lacked the flowage easement exception. Therefore, there is no question that Doubletree knew of the unilateral mistake by Lawyers Title in reducing the agreement to writing. Because a unilateral mistake by one party and knowledge of that mistake by the other party is equivalent to mutual mistake, the second part of the contract reformation test is also satisfied.

We hold that the magistrate judge correctly reformed the policy. The remainder of our analysis is based on the policy as thus reformed.

11

Nos. 12-40692 & 12-40702

## IV

As to whether the reformed policy covered survey errors in identifying the location of the flowage easement, for the reasons set forth below, we hold that it did. We therefore reverse the magistrate judge's summary judgment dismissing Doubletree's breach of contract claim.

Three provisions of the reformed policy are relevant to determining whether the survey error is covered, and therefore whether Lawyers Title breached the contract by failing to indemnify Doubletree for the error: (1) the survey coverage clause, (2) the flowage easement exception, and (3) the policy's exclusion 3(a). The parties disagree over the meaning and applicability of these provisions.

## A

We begin with Texas's breach of contract and title insurance law. In Texas, "[t]he elements of a claim for breach of contract are: (1) a valid contract between the plaintiff and the defendant, (2) performance or tender of performance by the plaintiff, (3) breach by the defendant, and (4) damage to the plaintiff as a result of the breach."[19]

Under Texas law, insurance policies are construed according to ordinary contract principles.[20] "The interpretation of an insurance policy is a question of law" for the court to determine.[21] "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed

---

[19] *E.g.*, *Ostrovitz & Gwinn, LLC v. First Specialty Ins. Co.*, 393 S.W.3d 379, 387 (Tex. App.—Dallas 2012, no pet.).

[20] *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994).

[21] *N.Y. Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996) (citing *Coker v. Coker*, 650 S.W.2d 391, 393-94 (Tex. 1983)).

in the instrument."[22] All of the provisions of the policy must be considered with reference to the whole instrument, so that no single provision alone is given controlling effect.[23]

Whether a contract is ambiguous is also a question of law.[24] "An ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations."[25] A contract is not ambiguous simply because the parties present conflicting interpretations.[26] If policy language can be given a definite or certain legal meaning, it is not ambiguous, and we will construe it as a matter of law without admitting evidence for the purpose of creating an ambiguity.[27] However, when the language of an insurance policy "is susceptible of more than one construction, [it] should be construed strictly against the insurer and liberally in favor of the insured."[28] Furthermore, when the language in question "involves an exception or limitation on [the insurer's] liability under the policy, an even more stringent construction is required."[29] Accordingly, when an insurance contract is subject to "more than one reasonable interpretation, we

---

[22] *Coker*, 650 S.W.2d at 393.

[23] *Id.*

[24] *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003) (citing *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998)).

[25] *Id.* (citing *Kelley–Coppedge, Inc.*, 980 S.W.2d at 465).

[26] *Id.*

[27] *Id.* (citing *Kelley–Coppedge, Inc.*, 980 S.W.2d at 464).

[28] *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987). The *Barnett* rule is sometimes referred to as the "contra-insurer rule." *E.g.*, *Jefferson Block 24 Oil & Gas, L.L.C. v. Aspen Ins. UK Ltd.*, 652 F.3d 584, 598 (5th Cir. 2011).

[29] *Barnett*, 723 S.W.2d at 666.

must resolve the uncertainty by adopting the construction that most favors the insured."[30]

When the disputed provision is an exclusion, the insurer has the burden of establishing that the exclusion applies.[31]  If an exclusion is ambiguous, "we must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not itself unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties['] intent."[32]

As the Texas Supreme Court indicated in *Shaver v. National Title & Abstract Co.*,[33] easements are a type of defect covered by title insurance policies in Texas, unless a valid exception or exclusion applies.[34]  *Shaver* held that a title insurance policy guaranteeing "good and indefeasible title" to the property purchased covered a gas pipeline easement across the property.[35]  Texas courts of appeals have likewise recognized that title insurance policies cover easements.[36]

---

[30] *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991) (citations omitted).

[31] *Guar. Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998).

[32] *Barnett*, 723 S.W.2d at 666 (internal quotation marks and citations omitted).

[33] 361 S.W.2d 867 (Tex. 1962), *overruled on other grounds by S. Title Guar. Co. v. Prendergast*, 494 S.W.2d 154, 158 (Tex. 1973).

[34] *Shaver*, 361 S.W.2d at 868-70.

[35] *Id.*

[36] *E.g.*, *San Jacinto Title Guar. Co. v. Lemmon*, 417 S.W.2d 429, 430-32 (Tex. App.—Eastland 1967, writ ref'd n.r.e.) (holding that a water line easement running across the property was covered by the title insurance policy, and observing that "[o]rdinarily a provision for insurance against loss generally, except for certain designated risks, includes loss from every cause not expressly excepted").

Nos. 12-40692 & 12-40702

As to survey coverage, the magistrate judge erred in concluding that it is not permitted under Texas law. Texas law requires title insurers to use policy provisions approved by the Texas Department of Insurance.[37] The standard title insurance form contains the standard survey exclusion identical to the one set forth in the original policy.[38] However, the Texas Department of Insurance explicitly allows title insurance companies to provide survey coverage by amending the standard survey exclusion.[39] In that event, the Texas Department of Insurance requires the standard survey clause to be modified to exclude only "shortages in area."[40]

**B**

---

[37] *See* TEX. INS. CODE ANN. § 2703.051 (West 2014) ("A title insurance policy . . . to insure an owner of real property must include certain provisions, the form and content of which shall be prescribed by the commissioner, in accordance with this subchapter.").

[38] *See* TEX. DEP'T OF INS., BASIC MANUAL OF TITLE INSURANCE, Section II, Form T-1, Schedule B, Item 2 (2013), *available at* http://www.tdi.texas.gov/title/titlem2b.html#FormT-1 (excluding coverage for "[a]ny discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements").

[39] *See* TEX. DEP'T OF INS., BASIC MANUAL OF TITLE INSURANCE, Section IV, P-2, Amendment of Exception to Areas and Boundaries (2014), *available at* http://www.tdi.texas.gov/title/titlem4a.html#P-2 ("[W]hen the Insured desires to have amended the exception as to area and boundaries, (i.e. Item 2 of Schedule B) to delete all save 'shortages in area', a title insurance company may accept an existing real property survey and not require a new survey when providing area and boundary coverage . . . ."); *see also id.* at P-8, Issuance of Policies Prior to Completion of Improvements, *available at* http://www.tdi.texas.gov/title/titlem4b.html ("[I]f a satisfactory survey made after the completion of improvements is furnished to the Company, survey coverage may be provided as set out in Rules R-16 and P-2, using the promulgated Endorsement form and containing the applicable promulgated language."); CHARLES J. JACOBUS & BILLIE J. ELLIS, JR., TEXAS TITLE INSURANCE § 6:27 (2d ed. 2012) ("The title company may provide affirmative insurance against encroachments and other survey matter if, and only if, the company amends its area and boundary exception pursuant to Procedural Rule P-2 . . . .").

[40] *See* TEX. DEP'T OF INS., BASIC MANUAL OF TITLE INSURANCE, Section IV, P-2, Amendment of Exception to Areas and Boundaries (2014), *available at* http://www.tdi.texas.gov/title/titlem4a.html#P-2.

15

Nos. 12-40692 & 12-40702

As to whether the survey coverage clause in the corrected policy provides coverage for the survey error in locating the flowage easement, we hold that both parties' interpretations of the clause are reasonable. As a result, we must adopt Doubletree's interpretation.

The survey coverage in the corrected policy that Doubletree purchased states in Schedule B:

> This policy does not insure against loss or damage . . . that arise by reason of . . . the following matters: . . .
> > 2. Shortages in area.

Before Doubletree paid the survey coverage premium, the title commitments contained the standard survey exception, excluding from coverage "[a]ny discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements." But in exchange for paying an additional premium and obtaining a survey, this standard survey exception was amended to exclude only shortages in area.

Lawyers Title argues that survey coverage does not cover all alleged defects in the survey, but only errors in identifying the boundaries of the property and any encroachments affecting those boundaries. More specifically, Lawyers Title argues that the larger scope of the flowage easement is not covered because it is not a "boundary line" or "encroachment" within the meaning of the language deleted from the standard survey exception. It also argues that the exception for the flowage easement precludes coverage of the flowage easement, regardless of the actual size or location of the easement.

Doubletree argues that the survey coverage it purchased covers all errors in the survey, including the error in describing the location of the flowage easement. Doubletree further contends that even if coverage is ambiguous, we

16

must interpret the policy in favor of coverage, pursuant to the *Barnett* contra-insurer rule.

Both parties have proffered reasonable interpretations of the survey exception clause. Lawyers Title understandably believes that changing the survey coverage clause from reading "[a]ny discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements" to reading only "[s]hortages in area" did not affect the coverage of the flowage easement at all. This is true because the flowage easement lies wholly within the boundaries of the property and does not affect those boundaries. Therefore, the flowage easement could not constitute a discrepancy or conflict in boundary lines, or a protrusion, or an overlapping of improvements, since these terms—discrepancy or conflict in boundary line, protrusion, or an overlapping of improvements—all concern the outer edges of the property. The only term removed from the survey coverage clause that may encompass an easement wholly within the property is "encroachments." But a few Texas cases have suggested that the term "encroachments" in the standard survey exception refers only to impediments at the boundary lines of the property.[41] In light of these cases, it is reasonable for Lawyers Title to believe

---

[41] *See Rockhold v. Fidelity Nat'l Title Ins. Co.*, No. 04-98-00504-CV, 1999 WL 239053, at *1-3 (Tex. App.—San Antonio Apr. 21, 1999, no pet.) (not designated for publication) (holding that the standard survey exception encompassed an easement—a neighbor's driveway—that crossed the boundaries of the insured property because the particular easement constituted an "encroachment" or a "boundary discrepancy" by "disrupt[ing] the boundary lines between the two properties," but warning that not "every easement constitutes a boundary discrepancy, encroachment or protrusion," thereby suggesting that "encroachments" only refers to easements affecting the boundaries of the property); *Cook Consultants, Inc. v. Larsen,* 677 S.W.2d 718, 720 (Tex. App.—Dallas 1984, writ granted), *aff'd in relevant part*, 690 S.W.2d 567 (Tex. 1985) (suggesting that "encroachments" has a similar meaning to the terms discrepancy, protrusion, and boundary); *Hous. Title Guar. Co. v. Fontenot*, 339 S.W.2d 347, 349-50 (Tex. Civ. App.—Houston 1960, writ ref'd n.r.e.) (suggesting that "encroachments" and "protrusions" have similar meanings and both refer to physical encumbrances at the boundaries of the property).

that the standard survey exception never affected the flowage easement since the flowage easement itself did not affect the boundaries of the property.

Lawyers Title's reading is supported by the fact that nothing in the title insurance policy affirmatively insured the accuracy of all aspects of the survey, such as the location of the flowage easement.[42]  In other cases, insurers have gone so far as to explicitly insure the location of easements shown on a survey,[43] but such language is absent here.  One reasonable interpretation of the corrected policy, then, is that the amendments to the standard survey exception did not affirmatively insure the location of the easement as shown on the survey.

On the other hand, however, Doubletree reasonably reads "encroachments" in the standard survey exception to include the flowage easement.  If "encroachments" includes the flowage easement, then removing "encroachments" from the standard survey exception would mean the flowage easement was no longer excepted from coverage, unless otherwise provided in the policy.  In fact, Black's Law Dictionary defines "encroachment" broadly as "[a]n infringement of another's rights."[44]  In light of this broad definition, it is reasonable for Doubletree to believe that the flowage easement—as an encroachment—was now excepted only to the extent it was shown on the survey.

---

[42] *See* BARLOW BURKE, LAW OF TITLE INSURANCE § 9.03 (2014) (recognizing that "[a]n exception is not the opposite of coverage and so eliminating [the standard survey exception] does not automatically provide coverage" for all aspects of the survey and noting that "[i]f an insured wants to obtain coverage for matters involving a survey, a separate endorsement is advisable").

[43] *Shea Homes, LLC v. Old Republic Nat'l Title Ins. Co.,* No. 3:05cv005, 2007 U.S. Dist. LEXIS 81965, at \*8-9 (W.D.N.C. Nov. 5, 2007) (interpreting a policy providing that "[t]he Company insures . . . that the easement is located as shown on the survey referenced above").

[44] BLACK'S LAW DICTIONARY 607 (9th ed. 2009).

Nos. 12-40692 & 12-40702

As the policy is ambiguous and is subject to at least two interpretations, we may consider "extraneous evidence to determine the true meaning of the instrument."[45]  One piece of extraneous evidence relied on by Doubletree is Lawyers Title's letter offering to provide Doubletree more complete title insurance coverage by amending the standard survey exception.  In that letter, Lawyers Title stated,

> In the interest of providing you with a more complete title insurance policy, if a qualifying survey has been required by your lender, we will collect the appropriate premium from you . . . and amend your title insurance policy to insure you against loss because of discrepancies or conflicts in boundary lines, encroachments or protrusions, or overlapping of improvements, excluding from the coverage specific matters disclosed by the survey.

This language certainly suggests that additional and meaningful survey coverage could be obtained by paying the premium, and that such coverage would exclude the listed encumbrances only to the extent shown on the survey. Reading this letter together with the title insurance policy, Doubletree reasonably believed it was purchasing survey coverage for any defects in title not correctly shown on the survey.

Because the approximate location of the flowage easement was in fact depicted on the survey, Doubletree had even more reason to believe that coverage of the flowage easement would be excluded only to the extent disclosed on the survey.  As the New Jersey Supreme Court has explained,

> The purpose of the survey exception is to exclude coverage *when the insured fails to provide the insurer with a survey*.  From a search of relevant public records, a title company cannot ascertain the risks that an accurate survey would disclose.  It is for this reason that the title company puts that risk on the insured, *who can control it either*

---

[45] *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333-34 (Tex. 2011) (internal quotation marks and citation omitted).

19

Nos. 12-40692 & 12-40702

*by obtaining a survey or arranging for the elimination of the survey exception.* Thus, the very purpose of a survey exception is to exclude from coverage errors that would be revealed not by a search of public records, but by an accurate survey.[46]

Either removal of the survey exception or amendments to that exception could therefore shift certain survey-related risks from the insured to the insurer.[47] As Doubletree obtained a survey, paid for an amended policy altering the standard survey exception, and received a survey disclosing the location of the flowage easement, it was reasonable for Doubletree to believe that the flowage easement was excluded only to the extent shown on the survey.

Additionally, neither the letter offering the more complete coverage nor the corrected policy itself clarifies that the "more complete title insurance policy" would not cover errors in identifying encumbrances shown on the survey that did not affect the boundaries of the property. In fact, one New Jersey court has considered and rejected Lawyers Title's position that survey coverage only insures the boundaries of the property and not encumbrances within the property.[48] Thus, one reasonable reading of the survey coverage here would be

---

[46] *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 562 A.2d 208, 217 (N.J. 1989) (emphasis added, internal citation omitted).

[47] *See* BARLOW BURKE, LAW OF TITLE INSURANCE § 9.03 (2014) (discussing removal of the standard survey exception and separate endorsements available to provide more coverage for matters involving a survey, but warning that "[a]n exception is not the opposite of coverage and so eliminating it does not automatically provide coverage").

[48] *See Enright v. Lubow*, 493 A.2d 1288, 1294-95 (N.J. Super. Ct. App. Div. 1985) (rejecting the insurer's argument that "the title insurance policy only insures the boundary of the survey but does not insure locations within the survey itself" and holding that the policy covered survey errors in identifying encumbrances within the property, stating, "the reasonable expectation of the insureds [was] that the purpose of requiring a survey is not only to locate the outbound lines of the survey but also to insure its accuracy in the location of those conditions which are shown within the boundaries of the survey").

20

that it covers not just encumbrances on the boundaries of the property, but also encumbrances lying wholly within the property.

This reading of the policy is also consistent with two Texas cases, as well as another New Jersey case. Each of these three cases holds that title defects are covered when the defect is not revealed due to a survey error and when language in the policy suggests there would be coverage for such errors. For example, in *Dallas Title & Guaranty Co. v. Valdes*,[49] a survey correctly reflected the boundary lines of a property but failed to reveal that nine-tenths of the lot had been conveyed to the State for use as a highway.[50] The policy at issue contained a survey exception for "[a]ny [discrepancies], conflicts, or shortages in area or boundary lines, or any encroachments, or any overlapping of improvements *which a correct survey would show*."[51] The *Valdes* court held that the defect in title, which was not shown on the survey, was covered because the parties intended to insure the lot as it appeared in the public records.[52] In reaching this result, the court also relied on the contra-insurer rule that "[t]he terms of the policy are to be construed liberally in favor of the insured."[53]

Another Texas case, *Lawyers Title Insurance Corp. v. McKee*,[54] reached the same result, holding that the title defect—a discrepancy in the boundary of the property—was covered because the policy contained an exception for encumbrances that a correct survey would show and the defect was not revealed

---

[49] 445 S.W.2d 26 (Tex. Civ. App.—Austin 1969, writ ref'd n.r.e.).

[50] *Valdes*, 445 S.W.2d at 27, 29-30.

[51] *Id.* at 27 (emphasis added).

[52] *Id.* at 30.

[53] *Id.*

[54] 354 S.W.2d 401 (Tex. Civ. App.—Fort Worth 1962, no writ).

on a survey of the property.[55]  A third case, *MacBean v. St. Paul Title Insurance Corp.*,[56] from New Jersey, involved a policy with an exception for encumbrances that a correct survey would show, but an addendum to the policy eliminated the exception, identified a specific survey, and stated that the survey "shows clear."[57] The court held that a defect in the survey, viz., failing to reveal that an abutting road actually lay on private property rather than public property, was covered by the policy's addendum since the addendum was ambiguous and therefore had to be interpreted in favor of the insured.[58]

In sum, each of these cases holds that survey errors are covered when the insured obtains a survey and believes, based on language in the policy, that there would be coverage for errors *not* shown on the survey.  Likewise here, Doubletree obtained a survey and believed it would be covered for survey errors not shown on the survey, given its purchase of additional survey coverage and the amendment to the standard survey exception.  These cases further support the reasonableness of Doubletree's reading of the reformed policy as covering the survey's erroneous identification of the flowage easement.

Because the survey coverage clause in the corrected policy is susceptible of more than one reasonable interpretation, Texas law mandates that we adopt Doubletree's interpretation since Doubletree is the insured and its interpretation is reasonable.[59]  Under Doubletree's reasonable interpretation, the survey

---

[55] *McKee*, 354 S.W.2d at 404-05.

[56] 405 A.2d 405 (N.J. Super. Ct. App. Div. 1979).

[57] *MacBean*, 405 A.2d at 407.

[58] *Id.* at 409.

[59] *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991).

coverage clause covered survey errors in identifying the location of the flowage easement. Thus, the magistrate judge erred in holding as a matter of law that the survey coverage clause does not provide such coverage.

## C

Lawyers Title argues that the flowage easement exception precludes coverage for the survey error in this case. We again hold that both parties' interpretations of the clause are reasonable and conclude that, as a result, we must adopt Doubletree's interpretation.

The reformed policy contains an exception referencing the flowage easement, and reads as follows:

> This policy does not insure against loss or damage . . . that arise by reason of . . . the following matters: . . .
>> 6. The following matters and all terms of the documents creating or offering evidence of the matters[:] . . .
>>> f. Flowage easement awarded to The United States of America in Condemnation Proceedings in U.S. District Court for the Eastern District of Texas, . . . a certified copy of which has been filed on January 10, 1956, recorded in Volume 418, page 372, Real Property Records, Denton County, Texas, and shown on survey dated March 22, 2006 by Mark Paine, RPLS #5078.

The title commitments before survey coverage was purchased by Doubletree included the same provision, except that the words "and shown on survey dated March 22, 2006 by Mark Paine, RPLS #5078" were not included. This language was added to the final amended policy after survey coverage was purchased.

Lawyers Title offers two alternative interpretations of the flowage easement exception. At oral argument, Lawyers Title's counsel said that the addition of the "and shown on survey" language to the exception is simply a notation to indicate that the surveyor identified the easement as affecting the property. Such addition does not affect the substance of the exception, Lawyers

Title's counsel contended. In its briefing, Lawyers Title alternatively argues that the district court was correct in concluding that the "and shown on survey" language actually expands the scope of the flowage easement exception, precluding coverage for the flowage easement as it exists in the real property records and as it is described in any other documents, like the survey.

Doubletree argues that the addition of the "and shown on survey" language to the flowage easement exception limits the exception to cover the easement only to the extent the easement is shown in the real property records *and* on the survey. Thus, any error in identifying the location of the easement in the survey would not be excepted from coverage.

We hold that Doubletree's interpretation and one of Lawyers Title's interpretations are reasonable. On the one hand, Lawyers Title's view that the "and shown on survey" language does not substantively alter the exception, but simply indicates that the survey was identified as affecting the property, is understandable. This additional language was also added to seven other exceptions involving easements of record, while a different phrase—"*as* shown on survey"—was added to one of the other exceptions regarding "[f]ences off property lines [and a] deck over property line." Given this difference, it is plausible that the "as shown on survey" phrase indicates that the fences and deck exception only covered the fence and deck to the extent shown on the survey, while the "and shown on survey" language simply indicates that the flowage easement actually affects the property. It is therefore reasonable to read the amended survey exception as continuing to except from coverage the entire flowage easement, despite its appearance on the survey.

On the other hand, Doubletree's interpretation, under which the title insurance policy covers the survey error in identifying the location of the flowage easement, is reasonable as well. Under Doubletree's reading, the addition of the

phrase "and shown on survey" to the flowage easement exception modifies that exception in a substantive way. This accords with the rule of contract construction requiring courts to give effect to every term of a contract so that none will be rendered meaningless.[60] It is also consistent with the commonsense notion that changes made to a policy after more coverage is purchased are reasonably interpreted to amount to a substantive increase in coverage. It is reasonable to read the amended language to mean that the flowage easement referenced in the real property records was accurately shown in the survey and was excepted only to that extent.

Finally, Lawyers Title's second interpretation of the "and shown on survey" language as expanding the exception and thereby reducing coverage under the policy is unreasonable. If the parties intended to expand the exception, the word "or" would have been used to except from coverage the easement as described in the real property records *or* as shown in the survey. We therefore hold that this interpretation is not supported by the plain language of the policy. Even if this interpretation could somehow be held reasonable, it is certainly no more reasonable than the two other interpretations discussed above. At most, it is another reasonable interpretation by Lawyers Title.

Just as the survey coverage clause was susceptible of multiple reasonable interpretations, so too is the flowage easement exception. Therefore, we again must adopt Doubletree's interpretation since Doubletree is the insured and its interpretation is reasonable.[61] According to Doubletree's reasonable interpretation, the flowage easement exception covers errors in identifying the

---

[60] *See Alpert v. Riley*, 274 S.W.3d 277, 288 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (citing *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998)).

[61] *See Nat'l Union*, 811 S.W.2d at 555.

Nos. 12-40692 & 12-40702

location of the flowage easement, so it was error to interpret the policy as excluding such coverage as a matter of law.

**D**

The third and final provision of the corrected policy we must consider is exclusion 3(a), which the magistrate judge held precluded coverage of the undisclosed magnitude of the flowage easement. We conclude that the exclusion does not bar Doubletree's claims.

The reformed policy contains a standard list of coverage exclusions. That portion of the policy provides:

> The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of: . . .
> 3. Defects, liens, encumbrances, adverse claims or other matters:
>     (a) created, suffered, assumed or agreed to by the insured claimant[.]

Lawyers Title argues that the district court was correct in concluding that Doubletree "suffered, assumed, or agreed" to the flowage easement as a defect in title under exclusion 3(a). Lawyers Title contends that Doubletree did so by virtue of three documents. First, in the sales contract, Doubletree agreed to purchase the property with the easement listed as a title defect.[62] Second, Doubletree accepted a deed stating that title was being conveyed "subject to" the flowage easement. Third, in the final title commitment, the flowage easement

---

[62] The sales contract does not explicitly reference the flowage easement; instead, it only says that a title insurance policy will be furnished by seller to buyer and describes that policy. It provides that the title insurance policy is "subject to . . . the following exceptions as may be approved by Buyer" and then lists several encumbrances, including "restrictive covenants affecting the Property." The sales contract also refers to the title commitment. Thus, the sales contract only refers to the flowage easement indirectly, in the sense that it describes the title policy and the title commitment, which both include the flowage easement as an exception using the "and shown on survey" language.

Nos. 12-40692 & 12-40702

was specifically identified as an exception. In addition, the district court held that Doubletree suffered, assumed, and agreed to the flowage easement under the terms of Doubletree and Duvall's leaseback agreement, which lists the flowage easement as a restrictive covenant and permitted encumbrance.

Doubletree argues that it could not have suffered, assumed, or agreed to the flowage easement as a title defect because it did not know the actual location and size of the recorded easement. Doubletree also maintains that the language of the deed—that it took the property "subject to" to the easement—does not establish that it suffered, assumed, or agreed to the flowage easement as a defect in title. Finally, Doubletree notes that the deed and other closing documents referred to the flowage easement as it was shown in the real property records *and* on the survey. Thus, even if it did assume the flowage easement as a defect in title, it only assumed it to the extent it was shown in the real property records *and* the survey.

In interpreting exclusion 3(a), which is a standard exclusion in policies across the country, courts agree that "'suffered' is synonymous with the word 'permit' and implies the power to prohibit or prevent the lien which has not been exercised although the insured has full knowledge of what is to be done with the intention that it be done."[63] The term "assume" in exclusion 3(a) "requires knowledge of the specific title defect assumed."[64] Courts have held that the insured party "does not assume an assessment against property 'merely because

---

[63] *Ariz. Title Ins. & Trust Co. v. Smith*, 519 P.2d 860, 863 (Ariz. Ct. App. 1974) (citing *Hansen v. W. Title Ins. Co.*, 33 Cal. Rptr. 668, 671 (Cal. Dist. Ct. App. 1963) and *First Nat'l Bank & Trust Co. v. N.Y. Title Ins. Co.*, 12 N.Y.S.2d 703, 709 (N.Y. Special Term 1939)); *see also Am. Sav. & Loan Ass'n v. Lawyers Title Ins. Corp.*, 793 F.2d 780, 784 (6th Cir. 1986).

[64] *Am. Sav. & Loan Ass'n*, 793 F.2d at 784.

he agreed to take the property 'subject to' any assessments.'"[65]  The last of the three terms at issue here—"agreed to"—"carries connotations of 'contracted,' requiring full knowledge by the insured of the extent and amount of the claim against the insured's title."[66]  All of the terms require some degree of intent to acquire the property with defects in its title.[67]  As the Eighth Circuit has summarized, under exclusion 3(a),

> the insurer can escape liability only if it is established that the defect, lien or encumbrance resulted from some intentional misconduct or inequitable dealings by the insured or the insured either expressly or impliedly assumed or agreed to the defects or encumbrances in the course of purchasing the property involved. The courts have not permitted the insurer to avoid liability if the insured was innocent of any conduct causing the loss or was simply negligent in bringing about the loss.[68]

Based on these standards, Doubletree did not suffer, assume, or agree to the undisclosed magnitude of the flowage easement for three main reasons. First, all four documents at issue include the "and shown on survey" language that the corrected policy contains.  Because the survey failed to disclose the full extent of the easement, Doubletree did not suffer, assume, or agree to the full extent of the easement as a defect in title.

Second, Doubletree did not suffer, assume, or agree to the undisclosed magnitude of the flowage easement because it did not have the requisite intent to do so.  As noted, all three of these terms require some degree of intent by the

---

[65] *Id.* (quoting *Smith*, 519 P.2d at 863).

[66] *Id.*

[67] *Id.*

[68] *Brown v. St. Paul Title Ins. Co.*, 634 F.2d 1103, 1107-08 n.8 (8th Cir. 1980) (collecting cases).

insured to acquire the property with the defect in its title.[69]  Here, if Doubletree intended to acquire the property with the flowage easement as a title defect, it only intended to do so to the extent that the easement was shown on the survey. This is evident from Doubletree's development plans, which accounted for the flowage easement, but only to the extent shown on the survey.  There is simply no summary judgment evidence to prove Doubletree had any intent to acquire the property with the full scope of the flowage easement as a title defect.  Because Lawyers Title has failed to show that Doubletree intended to acquire the property with the full magnitude of the flowage easement, it has failed to show that Doubletree suffered, assumed, or agreed to the easement.

Third, in addition to intent, the term "suffered, assumed, and agreed to" requires knowledge of the *extent* of the title defect.  More concretely, the term "agreed to" requires "full knowledge by the insured of the extent and amount of the claim against the insured's title."[70]  An insured only "assumes" the defect if it has "knowledge of the specific title defect assumed."[71]  Although Doubletree was aware that a flowage easement affected the property, it did not know the *extent* of the flowage easement.  Doubletree had some knowledge of the flowage easement as a defect in title, but certainly not full knowledge of the extent of that defect.  An insured does not suffer, assume, or agree to an encumbrance under this exclusion when it lacks knowledge of the true scope of the encumbrance.  In fact, Doubletree's lack of knowledge of the extent of the easement distinguishes this case from a Texas court of appeals case in which the insured had full knowledge of the encumbrance—a promissory note secured by a lien on the

---

[69] *Am. Sav. & Loan Ass'n*, 793 F.2d at 784.

[70] *Id.*

[71] *Id.*

## Nos. 12-40692 & 12-40702

property—since he himself executed the note, and thereby "created, suffered, assumed, or agreed to" the encumbrance under exclusion 3(a).[72] Even if exclusion 3(a) were ambiguous as to whether "suffered, assumed, or agreed to" requires knowledge of just the *existence* of the easement or knowledge of the *existence and extent* of the easement, we must adopt Doubletree's reasonable interpretation of the exclusion.

Most importantly, exclusion 3(a) would completely nullify the survey coverage if interpreted as Lawyers Title suggests. The magistrate judge was incorrect in concluding that the exclusion barred Doubletree's claim here.

### E

Lawyers Title has raised several other issues with regard to Doubletree's breach of contract claim. Because the magistrate judge interpreted the reformed policy as not covering Doubletree's claims, the magistrate judge did not reach these other issues raised by Lawyers Title. These issues could preclude rendering summary judgment for Doubletree on its breach of contract claim despite our interpretation of the reformed policy as covering Doubletree's claims.

For instance, Lawyers Title argues that coverage under the policy terminated when the property was sold at foreclosure. Although Doubletree filed claims with Lawyers Title before foreclosure, it did not assert claims based on the corrected policy's survey coverage until after foreclosure. Therefore, Lawyers Title asserts, it cannot be liable for breach of contract based on the survey coverage. Lawyers Title also contends that it properly denied Doubletree's

---

[72] *Duncan v. First Am. Title Ins. Co.*, No. C14-93-00171-CV, 1994 WL 2010, at *1, *4-5 (Tex. App.—Houston [14th Dist.] 1994, no writ) (not designated for publication) (holding that, because a warranty deed expressly stated that it was made "subject to" liens on the property and the insured himself executed the promissory note secured by a lien on the property, the insured and an entity for which he was the president and authorized agent "created, suffered, assumed, or agreed to" the note as an encumbrance on title).

original claims under the policy, since those claims were based on the original policy and Doubletree never submitted claims based on the corrected policy and the survey coverage that it included. According to Lawyers Title, Doubletree's failure to ever present a claim based on the corrected policy until this litigation was a failure to provide adequate notice of claim and proof of loss under the policy. Finally, Lawyers Title argues that Doubletree has failed to offer any evidence of a compensable loss under the policy that resulted solely from the flowage easement, and not the flood plain, which also affects the property.

The magistrate judge did not decide these issues. We therefore reject the magistrate judge's interpretation of the reformed policy and remand for consideration of these issues.

## V

Doubletree also appeals the magistrate judge's grant of summary judgment in favor of Lawyers Title on Doubletree's common law bad faith claims, its statutory bad faith claims under the Texas Insurance Code, and its claims under the Texas DTPA.[73] We affirm the grant of summary judgment as to these extracontractual claims.

Doubletree first contends that the magistrate judge erred in granting summary judgment to Lawyers Title on Doubletree's claim of common law breach of the duty of good faith and fair dealing. In the insurance context, the common law duty of good faith and fair dealing "arises from the special relationship" between the insurer and the insured.[74] "[A] breach of the duty of good faith and fair dealing will give rise to a cause of action in tort that is separate from any

---

[73] TEX. BUS. & COM. CODE ANN. §§ 17.41-63 (West 2014).

[74] *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 283 (Tex. 1994).

cause of action for breach of the underlying insurance contract."[75] However, "the threshold of bad faith is reached only when the breach of contract is accompanied by an independent tort."[76] "A cause of action is stated when the insured alleges that the insurer had no reasonable basis for the denial or delay in payment of a claim and that the insurer knew or should have known of that fact."[77] Accordingly, the evidence pointing to bad faith "must relate to the tort issue of no reasonable basis for denial or delay in payment of a claim, not just to the contract issue of coverage."[78]

The magistrate judge noted that "in order to recover for breach of the duty of good faith and fair dealing, Doubletree [first had to] establish that Lawyers Title breached the contract." Because the magistrate judge held that the policy did not cover Doubletree's claim, he concluded that Doubletree had not established such a breach and held that "Lawyers Title clearly had a reasonable basis for [its] denial."

Although we disagree with the magistrate judge's conclusion that Lawyers Title did not breach the contract as a matter of law, we nevertheless affirm the grant of summary judgment as to the breach of good faith and fair dealing claim because Doubletree did not offer evidence that creates a genuine dispute of fact as to whether there was a "reasonable basis for the denial of coverage." As we have already noted, both Lawyers Title and Doubletree have offered reasonable

---

[75] *Viles v. Sec. Nat'l Ins. Co.*, 788 S.W.2d 566, 567 (Tex. 1990).

[76] *Union Bankers*, 889 S.W.2d at 283.

[77] *Id.*

[78] *Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 600 (Tex. 1993).

interpretations of the reformed policy. Although we adopt Doubletree's interpretation under the well-known contra-insurer rule, Lawyers Title's interpretation of the reformed policy, under which Doubletree's claim is not covered, is also reasonable. Lawyers Title thus had a reasonable basis for its denial of coverage.

Additionally, Doubletree's initial claims were based on the policy as originally issued—that is, the claims relied on the fact that the exception for the flowage easement was not in the original policy. Doubletree never submitted a claim under the corrected policy nor did it assert at the claims stage that the incorrect survey provided a basis for coverage. In fact, Doubletree did not assert its survey theory of coverage until after the commencement of this litigation. Given our conclusion that reformation of the policy was appropriate in these circumstances, Lawyers Title's reliance on the flowage easement exception as a basis for denying coverage of Doubletree's initial claim was neither incorrect nor in bad faith. Doubletree thus did not offer sufficient evidence that Lawyers Title "had no reasonable basis for the denial or delay in payment of a claim" or that Lawyers Title "knew or should have known of that fact."[79]

Doubletree also contends that Lawyers Title violated its statutory duty of good faith under Texas Insurance Code § 541.060(a)(2) because it "made no effort to settle the Title Loss Claim." Section 541.060 provides, in relevant part, that

> (a) It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to engage in the following unfair settlement practices with respect to a claim by an insured or beneficiary: . . .

---

[79] *Union Bankers*, 889 S.W.2d at 283.

Nos. 12-40692 & 12-40702

(2) failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of:

(A) a claim with respect to which the insurer's liability has become reasonably clear[.][80]

Doubletree asserts similar claims under the DTPA, alleging, inter alia, that Lawyers Title's denial of coverage was unconscionable and that Lawyers Title failed to settle in good faith, failed to provide an adequate explanation for the denial, failed to conduct a reasonable investigation, rewrote the policy after Doubletree made a claim, and made certain "disingenuous" arguments during the course of this litigation.

We have previously noted that "Texas courts have clearly ruled that . . . extra-contractual tort claims [under the DTPA and the Insurance Code] require the same predicate for recovery as bad faith causes of action in Texas."[81] Accordingly, "an insurer will not be faced with a tort suit for challenging a claim of coverage if there was any reasonable basis for denial of that coverage."[82] As we have already discussed, Lawyers Title had a reasonable basis for denying Doubletree's claim.   Doubletree's claims under the DTPA and the Texas Insurance Code thus fail for the same reasons as its common law bad faith claim.

## VI

In a consolidated appeal, Doubletree's attorneys, Kalis and Martin, challenge the magistrate judge's award of attorneys' fees to Lawyers Title under

---

[80] TEX. INS. CODE ANN. § 541.060 (West 2014).

[81] *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 460 (5th Cir. 1997) (citing *Emmert v. Progressive Cnty. Mut. Ins. Co.*, 882 S.W.2d 32, 36 (Tex. App.—Tyler 1994, writ denied) and *State Farm Lloyds, Inc. v. Polasek*, 847 S.W.2d 279, 282 n.2 (Tex. App.—San Antonio 1992, writ denied)).

[82] *Id.* (citing *Emmert*, 882 S.W.2d at 36).

Nos. 12-40692 & 12-40702

28 U.S.C. § 1927. The magistrate judge granted in part Lawyers Title's motion for attorneys' fees and ordered Kalis and Martin to pay $55,310.00 to Lawyers Title. The magistrate judge imposed the sanctions based on the lawyers' pursuit of Doubletree's extracontractual claims. We hold that the magistrate judge abused his discretion in awarding fees to Lawyers Title.

Lawyers Title argues the award of fees was appropriate because Kalis and Martin persistently pursued meritless extracontractual claims, which were unsupported by the facts or law. Pursuit of these claims, Lawyers Title argues, multiplied the proceedings and distracted it and the court from the breach of contract issue. Lawyers Title further contends that Doubletree's counsels' conduct in pursuit of its claims—including inadequate citations of authority in briefing and persistent assertions of baseless arguments—also supports an award of attorneys' fees.

Kalis and Martin argue that, for several reasons, the fee award was inappropriate here. First, Kalis and Martin note that, when they first entered their appearance in this lawsuit filed by Lawyers Title in the Eastern District of Texas, Doubletree had already filed a separate state court action alleging the extracontractual claims against Lawyers Title. At that time, Doubletree was represented by different counsel in its state court lawsuit. After entering their appearance, Kalis and Martin believed the state court extracontractual claims might be compulsory counterclaims in the federal court lawsuit and would be waived if not asserted under Federal Rule of Civil Procedure 13(a). Kalis and Martin offered to enter into a non-waiver agreement with Lawyers Title to toll the extracontractual claims and thereby avoid having to litigate them until the policy coverage question was decided. Lawyers Title rejected the offer. At that

35

Nos. 12-40692 & 12-40702

point, fearing they would commit legal malpractice if the extracontractual claims were not pursued in federal litigation, Kalis and Martin filed the extracontractual claims in federal court. Based on this series of events, Kalis and Martin argue that their conduct was not unreasonable or vexatious, but rather a good-faith effort to avoid waiving Doubletree's extracontractual claims.

Kalis and Martin also argue that, even if the court concludes that the extracontractual claims lack merit, Lawyers Title has not shown that their conduct in pursuing the claims rose to the level of bad faith, improper motive, or reckless disregard, as required for a fee award under § 1927. Further, Kalis and Martin contend, their references to Lawyers Title's "time traveling policy" and their allegations that Lawyers Title went back in time to rewrite its insurance policy do not warrant a fee award.

As mentioned, we review an award of sanctions under § 1927 for abuse of discretion.[83] Section 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.[84]

An award of attorneys' fees under § 1927 requires "evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court."[85] In

---

[83] *See Cambridge Toxicology Grp., Inc. v. Exnicios*, 495 F.3d 169, 180 (5th Cir. 2007) ("A district court abuses its discretion if it awards sanctions based on an erroneous view of the law or on a clearly erroneous assessment of the evidence.") (internal quotation marks and citation omitted).

[84] 28 U.S.C. § 1927.

[85] *Cambridge Toxicology*, 495 F.3d at 180 (quoting *Procter & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 525 (5th Cir. 2002)).

awarding fees under this provision, "[t]he district court must make detailed factual findings."[86] Specifically, the court is required to "(1) identify sanctionable conduct and distinguish it from the reasons for deciding the case on the merits, (2) link the sanctionable conduct to the size of the sanctions, and (3) differentiate between sanctions awarded under different statutes."[87] Further, punishment under § 1927 is "sparingly applied."[88] This court has held that sanctions under § 1927 are "punitive in nature and require clear and convincing evidence" that sanctions are justified.[89] "An unsuccessful claim is not necessarily actionable."[90] Section 1927 sanctions should be employed "only in instances evidencing a serious and standard disregard for the orderly process of justice," lest "the legitimate zeal of an attorney in representing [a] client [be] dampened."[91]

Here, the magistrate judge abused his discretion in awarding fees to Lawyers Title. First, there is no clear and convincing evidence that Kalis and Martin's conduct in filing and litigating the extracontractual claims was a result of bad faith, improper motive, or reckless disregard of the duty owed the court. The evidence instead shows that Kalis and Martin acted in good faith in pursuing the extracontractual claims because they sincerely believed that those claims

---

[86] *Id.*

[87] *Id.* at 180-81 (quoting *Procter & Gamble Co.*, 280 F.3d at 526).

[88] *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 535 (5th Cir. 1996) (internal quotation marks and citation omitted).

[89] *Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 694 (5th Cir. 2010) (internal quotation marks and citation omitted).

[90] *See Hogue v. Royse City, Tex.*, 939 F.2d 1249, 1256 (5th Cir. 1991).

[91] *FDIC v. Conner*, 20 F.3d 1376, 1384 (5th Cir. 1994) (internal quotation marks and citations omitted).

would be waived if not asserted in federal court.  Indeed, they even tried to put the extracontractual claims "on hold" pending resolution of the breach of contract issue, but Lawyers Title's attorneys rejected this offer.  Lawyers Title has not contradicted this evidence of good faith by showing at least a reckless disregard of the duty owed the court by Kalis and Martin.  At most, it has shown that Doubletree's extracontractual claims lack merit, which is not a sufficient basis for awarding sanctions.

Second, the reasons given by the magistrate judge for awarding sanctions do not support his award.  The magistrate judge noted that the extracontractual claims had no basis in fact, emphasizing that Doubletree "could not identify a single misrepresentation made by" Lawyers Title.  For one thing, whether the claims pursued had a "basis in fact" is not the applicable standard in reviewing a sanctions award: The standard is whether the claims were pursued in bad faith, for improper motive, or in reckless disregard of the duty owed the court.  As discussed, that standard has not been satisfied.  In addition, although Doubletree originally brought fraud and negligent misrepresentation claims, the majority of Doubletree's claims were not that Lawyers Title made express misrepresentations, but that Lawyers Title had no reasonable basis for denying coverage, failed to settle in good faith, failed to provide an adequate explanation of denial, and other similar claims.  Therefore, even if Doubletree never identified a misrepresentation by Lawyers Title, it still might recover on many of its extracontractual claims.

The magistrate judge also based his award on the fact that Kalis and Martin alleged that Lawyers Title had the ability to "time travel," repeatedly accused Lawyers Title of going back in time to rewrite its insurance policy, and

questioned witnesses regarding their ability to "time travel." Although this was inappropriate rhetoric, alone it does not rise to the level of bad faith, improper motive, or reckless disregard for the duty owed the court.

In conclusion, the magistrate judge abused his discretion in awarding fees, and we thus reverse the fee award to Lawyers Title.

\* \* \*

For the foregoing reasons, the magistrate judge's order granting Lawyers Title's motion for summary judgment and denying Doubletree's motion for summary judgment is AFFIRMED IN PART, REVERSED IN PART, AND REMANDED for further proceedings consistent with this opinion, and the magistrate judge's order awarding attorneys' fees to Lawyers Title is REVERSED.